UNITED STATES *v.* SAN JACINTO TIN COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF CALIFORNIA.

No. 887. Argued January 26, 27, 30, 1888. — Decided March 19, 1888.

A suit may be brought by the United States in any court of competent juris-diction to set aside, cancel, or annul a patent for land issued in its name, on the ground that it was obtained by fraud or mistake.

The initiation and control of such a suit lies with the Attorney General as the head of one of the Executive Departments.

But the right to bring such a suit exists only when the government has an interest in the remedy sought by reason of its interest in the land, or the fraud has been practised on the government and operates to its prejudice, or it is under obligation to some individual to make his title good by set-ting aside the fraudulent patent, or the duty of the government to the public requires such action.

When it is apparent that the only purpose of bringing the suit is to benefit one of two claimants to the land, and the government has no interest in the matter, the suit must fail.

In the case before us the alleged fraud, for which it is sought to annul the patent, is in the survey of a confirmed Mexican grant, on which the patent was issued; and it is charged that at the time the survey was made the Commissioner of the General Land Office, the Surveyor General for California, the chief clerk of the latter's office, and the deputy who made the survey, were interested in the ownership of the grant, and by fraud made a false location of the land to make it contain valuable ores of tin not within its limits if fairly surveyed.

Of all the officers here charged only Conway, the chief clerk, had any real interest in the claim, and he notified the Surveyor General of his interest, and refused to have anything to do with the survey; it is nowhere shown that he in any manner influenced the location of the survey, and it is denied under oath by all who took part in making it.

The fact is much relied on that some of these officers, after the patent was issued, took shares in a joint stock corporation organized to work the

mine, but there is no proof that the shares were a voluntary gift, or were for services rendered in locating the survey, and the fairness of the purchase of these shares after the patent issued is sustained by affirmative testimony.

The fact that this survey was contested at every step by interested parties, and was returned to the surveyor's office for correction, was twice before that office and twice before the Commissioner in Washington, and finally decided after six months' consideration by the Secretary of the Interior, confirming the decision of the Land Office, affords very strong evidence of the correctness and honesty of the survey

In the *Maxwell Land Grant Case*, 121 U. S. 325, we expressed ourselves fully in regard to the testimony necessary to enable a court of chancery to set aside such a solemn instrument as a patent of the United States. It was there said, " that when in a court of equity it is proposed to set aside, to annul, or to correct a written instrument for fraud or mistake in the execution of the instrument itself, the testimony on which this is done must be clear, unequivocal, and convincing, and that it cannot be done upon a bare preponderance of evidence which leaves the issue in doubt." There is no such convincing evidence of fraud in the present case.

BILL in equity to set aside a patent of public land. Decree dismissing the bill, from which complainant appealed. The case is stated in the opinion of the court.

*Mr. Solicitor General* and *Mr. G. Wiley Wells* for appellant.

*Mr. William M. Stewart* for appellees.

MR. JUSTICE MILLER delivered the opinion of the court.

The suit in this case, which was a bill in chancery filed April 10, 1883, in the Circuit Court for the District of California, purports to be brought by the Attorney General on behalf of the United States against the San Jacinto Tin Company, the Riverside Canal Company, and the Riverside Land and Irrigating Company. These corporations are alleged to be in possession of a large body of land, nearly eleven square leagues in extent, for which a patent was issued by the United States on the 26th day of October, 1867, to Maria del Rosario Estudillo de Aguirre, and her heirs and assigns. The object of the bill is to set aside this patent, and have it declared void,

upon the ground that the land described in the survey, which description is a part of the patent, is not the land granted by the Mexican government to said Maria, nor that which was confirmed to her under the proceedings before the land commission, and by the judgment of the District Court of the United States, and by this court also on appeal. The essential feature of the grievance relied on by the complainant is, that this survey was thus located by fraud to include different and more valuable land than that granted by Mexico and confirmed by the courts, and on account of this fraud it is prayed that the survey and patent be set aside and annulled.

Perhaps the nature of this proceeding cannot be better stated than in the language that heads the brief or printed argument of the appellant, who was plaintiff below. It is as follows:

"This brief is intended to establish the following general proposition, viz.: That the lands hereinafter described as patented to Maria del Rosario de Aguirre, and her heirs and assigns, on the 26th day of October, 1867, were obtained from the United States by a fraudulent survey of the lands described therein in violation of the decree of the court; and that the persons engaged in said fraudulent survey were the beneficiaries thereof; and that, by reason thereof, said patent to the same is void, and should be set aside, vacated, and annulled."

The case was heard in the Circuit Court on the bill, answer, replication, and voluminous testimony, by the Circuit and District Judges sitting together, who concurred in the decree dismissing the bill.

The bill sets out a grant to one Maria del Rosario Estudillo de Aguirre of the surplus or "sobrante" of the Ranchos of San Jacinto Viejo y Nuevo, or the overplus which remains in the Ranchos of Old and New San Jacinto, the survey thereof to commence from the boundaries of Don José Antonio Estudillo and Don Miguel Pedrorena. It alleges that this grant was afterwards confirmed by the District Court of California on appeal from the land commission. Upon an appeal taken from that court to the Supreme Court of the United States its judgment was affirmed. The decision of the land commission

was to the effect that the claimant was entitled to five square leagues of land within this sobrante or surplus. The District Court, however, held that the claimant was entitled to eleven square leagues, if so much should be found within the sobrante, and to all that was found therein if it were less than that amount.

The language of this decree, as set forth in the body of the bill, and affirmed by the Supreme Court of the United States at its December Term, 1863, *United States* v. *D'Aguirre*, 1 Wall. 311, describes the land confirmed as "the sobrante or surplus lands remaining within the boundaries of the tract of land called San Jacinto, as the same are represented and described in the map of said tract contained in the expediente of Miguel Pedrorena filed in this case and referred to in the grant, over and above certain lands granted to José Antonio Estudillo, and certain other lands granted to Miguel Pedrorena, within the aforesaid boundaries, to the extent of eleven square leagues of land; and if said sobrante or surplus within said boundaries should be less than eleven square leagues, then such less quantity." The bill alleges that the location by survey of the lands confirmed by this decree was not at all within the sobrante of the San Jacinto grant, but that it was located upon other lands than those on which it should have been, because those which were embraced by the survey were valuable as containing ores of tin; and that nearly all the officers engaged in making or establishing it, from and including the Commissioner of the General Land Office down to the deputy surveyors, were interested in the claim at the time.

It is alleged that throughout the whole transaction, from the beginning of the effort to have this survey made until its final completion and the issue of the patent, all the proceedings were dictated by fraud, and all the officers of the government below the Secretary of the Interior who had anything to do with it were parties to that fraud, and to be benefited by it.

The principal points upon which this fraud is said to rest are, that the land surveyed was not within the larger exterior boundaries out of which the sobrante of San Jacinto Viejo y Neuvo was to be taken, but that said survey described a tract

of land of about the same extent, to wit, of about eleven square leagues, situated more than six miles at the nearest point, and more than twenty miles at the farthest point, away from the land in fact granted and conceded by Pio Pico, governor, to the grantee; that the survey of said land was never made in the field, nor from any actual measurements of distances or observation or determination of courses in the field, as the law of the land department required, nor according to the directions of the decree confirming said grant; that the plat and survey were made arbitrarily and without any actual data in the office of the Surveyor General of the United States for California, under the direction and dictation of that officer and one Edward Conway, then chief clerk in charge of that office, and performing the duties of Surveyor General, and by one George H. Thompson, a deputy surveyor acting under the Surveyor General and the chief clerk; that it was so made up without any reference to the expediente that accompanied the grant or juridical possession given at the time of the grant, or to the decree, but that it was made solely with reference to securing, surreptitiously and fraudulently, letters-patent for the land included and described within the said survey and plat, although the same lies outside of the boundaries of the tract called San Jacinto; that the land so surveyed and platted was at that time supposed by said Surveyor General and Edward Conway to contain, and did in fact contain, valuable lodes of tin and other mineral ores, and that all this was well known to the defendant, or to persons composing its stockholders, at the time the patent was issued.

It is further alleged that Upson the Surveyor General, Conway, the chief clerk in his office, and Thompson, the deputy who was directed to make the survey and did make the plat, and Joseph H. Wilson, the Commissioner of the General Land Office at Washington, were all interested in and part owners of the claim at the time this survey was made, and at the very time they acted in reference to its final confirmation. Other persons are also said to be inculpated in this fraudulent proceeding whose names it is not necessary at present to mention.

It will thus be seen that the entire foundation for the relief sought in this case rests upon a fraud alleged to have been committed upon the government by its own officers, they being interested in the claim to be surveyed and patented. There is no pretence of any mere mistake in the matter, but on the contrary it is asserted that the parties knew exactly what they were doing, and that it was intended to cheat the United States out of valuable mineral ores for the benefit and advantage of those parties and their confederates. The issue is thus narrowed exclusively to the question of fraud.

Another question, however, is raised by counsel for the defendant, which is earnestly insisted upon by them, and which received the serious consideration of the judges in the Circuit Court, namely, the right of the Attorney General of the United States to institute this suit.

The question as presented is one surrounded by some embarrassment. But as it is in some form or other of frequent recurrence recently, and if decided in favor of the appellees will require the dismissal of the case without a judgment by this court upon its merits, we feel called upon to give the matter our attention. It is denied that the Attorney General has any general authority under the Constitution and laws of the United States to commence a suit in the name of the United States to set aside a patent, or other solemn instrument issued by proper authority.

It is quite true that the Revised Statutes, in the title which establishes and regulates the Department of Justice, simply declares, in § 346, that "there shall be at the seat of government an Executive Department to be known as the Department of Justice, and an Attorney General, who shall be the head thereof." There is no very specific statement of the general duties of the Attorney General, but it is seen from the whole chapter referred to that he has the authority, and it is made his duty, to supervise the conduct of all suits brought by or against the United States, and to give advice to the President and the heads of the other departments of the government. There is no express authority vested in him to author-ize suits to be brought against the debtors of the government,

or upon bonds, or to begin criminal prosecutions, or to institute proceedings in any of the numerous cases in which the United States is plaintiff; and yet he is invested with the general superintendence of all such suits, and all the district attorneys who do bring them in the various courts in the country are placed under his immediate direction and control. And notwithstanding the want of any specific authority to bring an action in the name of the United States to set aside and declare void an instrument issued under its apparent authority, we cannot believe that where a case exists in which this ought to be done it is not within the authority of that officer to cause such action to be instituted and prosecuted. He is undoubtedly the officer who has charge of the institution and conduct of the pleas of the United States, and of the litigation which is necessary to establish the rights of the government.

If the United States in any particular case has a just cause for calling upon the judiciary of the country, in any of its courts, for relief by setting aside or annulling any of its contracts, its obligations, or its most solemn instruments, the question of the appeal to the judicial tribunals of the country must primarily be decided by the Attorney General of the United States. That such a power should exist somewhere, and that the United States should not be more helpless in relieving itself from frauds, impostures, and deceptions than the private individual, is hardly open to argument. The Constitution itself declares that the judicial power shall extend to all cases to which the United States shall be a party, and that this means mainly where it is a party plaintiff is a necessary result of the well-established proposition that it cannot be sued in any court without its consent. There must, then, be an officer or officers of the government to determine when the United States shall sue, to decide for what it shall sue, and to be responsible that such suits shall be brought in appropriate cases. The attorneys of the United States in every judicial district are officers of this character, and they are by statute under the immediate supervision and control of the Attorney General. How, then, can it be argued that if the United States has been deceived, en-

trapped, or defrauded into the making, under the forms of law, of an instrument which injuriously affects its rights of property, or other rights, it cannot bring a suit to avoid the effect of such instrument, thus fraudulently obtained, without a special act of Congress in each case, or without some special authority applicable to this class of cases, while all other just grounds of suing in a court of justice concededly belong to the Department of Justice, and are in use every day? The judiciary act of 1789, in its third section, which first created the office of Attorney General, without any very accurate definition of his powers, in using the words that "there shall also be appointed a meet person, learned in the law, to act as Attorney General for the United States," 1 Stat. 93, c. 21, § 35, must have had reference to the similar office with the same designation existing under the English law. And though it has been said that there is no common law of the United States, it is still quite true that, when acts of Congress use words which are familiar in the law of England, they are supposed to be used with reference to their meaning in that law. In all this, however, the Attorney General acts as the head of one of the Executive departments, representing the authority of the President in the class of subjects within the domain of that department and under his control.

In the case of the *United States* v. *Hughes*, 11 How. 552, one Godbee had entered and paid for land at the United States land office in New Orleans, but had not taken out his patent. Hughes, well knowing this fact, entered, paid for, and received a patent for the same land, the prior entry of Godbee being overlooked by the land officers. The United States having tendered Hughes his purchase money, the Attorney General filed an information on behalf of the United States to repeal the patent. The defendant, Hughes, demurred on the ground that no authority existed for bringing such a suit; but this court, saying that it cannot "be conceived why the government should stand on a different footing from any other proprietor," p. 568, overruled the demurrer. When the case afterwards came into this court on appeal from the decree on the final hearing, it said: "It was the plain duty of the United

States to seek to vacate and annul the instrument, to the end that their previous engagement might be fulfilled by the transfer of a clear title, the only one intended for the purchaser by the act of Congress." *Hughes* v. *United States*, 4 Wall. 232.

In *United States* v. *Stone*, 2 Wall. 525, Mr. Justice Grier, delivering the opinion of the court, said : " A patent is the highest evidence of title, and is conclusive as against the government, and all claiming under junior patents or titles, until it is set aside or annulled by some judicial tribunal. In England this was originally done by *scire facias*, but a bill in chancery is found a more convenient remedy," p. 535.

In the case of *Mowry* v. *Whitney*, 14 Wall. 434, 439, 440, which was an attempt by a private party to set aside by a bill in chancery a patent for an invention, the court considered the subject rather fully, and said that " the ancient method of doing this in the English courts was by *scire facias*, and three classes of cases are laid down in which this may be done." The court held that in England " the *scire facias* to repeal a patent was brought in chancery where the patent was of record. And though in this country the writ of *scire facias* is not in use as a chancery proceeding, the nature of the chancery jurisdiction and its mode of proceeding have established it as the appropriate tribunal for the annulling of a grant or patent from the government," referring to *United States* v. *Stone*, above cited. The court denied the right of the private party to sustain a suit to annul the patent, and said : " The general public is left to the protection of the government and its officers. . . . The reasons for requiring official authority for such a proceeding are obvious. The fraud, if one exists, has been practised on the government, and as the party injured it is the appropriate party to assert the remedy or seek relief." p. 441.

In *United States* v. *Throckmorton*, 98 U. S. 61, 70, the court said : " In the class of cases to which this belongs, however, the practice of the English and the American courts has been to require the name of the Attorney General as indorsing the suit before it will be entertained. The reason of this is obvious, namely, that in so important a matter as impeaching the

grants of the government under its seal, its highest law officer should be consulted, and should give the support of his name and authority to the suit. He should also have control of it in every stage, so that if at any time during its progress he should become convinced that the proceeding is not well founded, or is oppressive, he may dismiss the bill."

In *Moore* v. *Robbins*, 96 U. S. 530, 533, the court, speaking of the issuing of patents for land by the government, said: "If fraud, mistake, error, or wrong has been done, the courts of justice present the only remedy. These courts are as open to the United States to sue for the cancellation of the deed or reconveyance of the land as to individuals; and if the government is the party injured, this is the proper course."

While the cases last cited did not involve directly the power of the Attorney General to institute a suit to set aside a patent of the United States, we have had before us quite recently three cases which did involve that power, brought by the United States for the express purpose of setting aside patents for land issued by the government on the ground of frauds or mistakes in their issue. In the first of these, *Moffat* v. *United States*, 112 U. S. 24, which was prosecuted by the Attorney General, who appeared in this court by the Assistant Attorney General to argue the case, the decree of the Circuit Court setting aside the patent as having been obtained by the fraud of the officers of the land department was affirmed. No question was made of the right of the Attorney General to institute the suit and conduct it to a successful termination.

In the second case *United States* v. *Minor*, 114 U. S. 233, 241, a suit was brought in the Circuit Court for the District of California to set aside a patent for land issued by the government to Minor. The bill alleged that the patent was obtained by the fraud of Minor in making false affidavits and procuring others to be made before the officers of the land department, by which he obtained the patent for the land in question. Although the case was certified here by the judges sitting in that court on a division of opinion upon several points, one of which was whether a demurrer to the amended bill should be sustained, no question seems to have been made of the right

of the government by its Attorney General to institute this suit; the appeal on behalf of the United States being argued by the Solicitor General, an officer under the control of the Attorney General.

Some question was, however, made in the opinion in that case in regard to the right of the Attorney General to bring such a suit, where the only result would have been to take the land from Minor and give it to one Spence, who had a claim upon part of it, the court saying that "the government in that case would certainly have no interest in the land when recovered, as it must go to Spence without any further compensation. And it may become a grave question, in some future case of this character, how far the officers of the government can be permitted, when it has no interest in the property or in the subject of the litigation, to use its name to set aside its own patent, for which it has received full compensation, for the benefit of a rival claimant." The court said, however, that the question did not arise in that case, because Spence only had a claim to one-half of the land covered by the patent. It will be seen that the only question thus suggested did not affect the right of the Attorney General in a proper case to institute and carry on such a suit; and the decree of the Circuit Court was reversed on the ground that the case presented was one which justified relief.

In the still later case of *The Colorado Coal & Iron Company* v. *United States*, 123 U. S. 307, the bill was filed in the name of the United States by the Attorney General to declare void and cancel sixty-one patents for as many distinct pieces of land, situated at different places in Las Animas County, in the State of Colorado, amounting in the aggregate to over nine thousand acres. The allegation in that case was, that the patent had been obtained by the fraudulent use of fictitious names as grantees of the land, and the case was fought through with great vigor on both sides. It was thoroughly and elaborately considered, and the court said, in regard to these transactions, that they "undoubtedly constituted a fraud upon the United States sufficient in equity as against the parties perpetrating it, or those claiming under them with notice of

it, to justify the cancellation of the patents issued to them," quoting the following language from *United States* v. *Minor*, above cited : "Where the patent is the result of nothing but fraud and perjury, it is enough to hold that it conveys the legal title, and it would be going quite too far to say that it cannot be assailed by a proceeding in equity and set aside as void, if the fraud is proved and there are no innocent holders for value."

If the court had entertained the opinion in these cases, that there existed in the Attorney General no right to institute these suits to set aside patents for lands obtained by fraud, it would have been saved the labor of a protracted investigation in each of them into the facts which were supposed to constitute the fraud; and in the two cases first mentioned the court violated its duty in sustaining the government and setting aside the patents if there existed in its judgment no right in the Attorney General to institute such suits.

We are not insensible to the enormous power and its capacity for evil thus reposed in that department of the government. Since the title to all of the land in more than half of the States and Territories of the Union depends upon patents from the government of the United States, it is to be seen what a vast power is confided to the officer who may order the institution of suits to set aside every one of these patents; and if the doctrine that the United States in bringing such actions is not controlled by any statute of limitations, or governed by the rule concerning *laches* be sound, of which we express no opinion at present, then the evil which may result would seem to be endless as well as enormous.   But it has often been said that the fact that the exercise of power may be abused is no sufficient reason for denying its existence, and if restrictions are to be placed upon the exercise of this authority by the Attorney General, it is for the legislative body which created the office to enact them.

We do not think, therefore, that it can be successfully denied that there exists in the Attorney General, as the head of the Department of Justice, the right to institute, in the name of the United States, a suit to abrogate, annul, or set aside a patent for land which has been issued by the government in a

case where such an instrument if permitted to stand would work serious injury to the United States, and prejudice its interests, and where it has been obtained by fraud, imposture, or mistake.

One of the difficulties attending the present case and others of like character which have come before us, in which the authority of the Attorney General to institute the suit has been questioned, is, that no specific plea has been filed denying this authority, or alleging that the suit as made by the bill, or established by the evidence, does not come within the class of cases in which that officer can exercise this power.

There is no plea in this case, and all that is said upon this subject in the answer is in the following language: "If said officers" [meaning the President, the Secretary of the Interior, and the Commissioner of the General Land Office, who were such at the time this action was begun] "had consulted the records they would have been easily informed of the truth; but the said Attorney General is now informed and moved and instigated by the same parties who made the contest in the land department before the issuing of the said patent, and M. G. Cobb, the same attorney who drew the bill herein, and instigated the suit and conducts the same, was the attorney of said contestants in said proceedings, and has represented said parties as such attorney and counsel from the filing of said objections by said Stearns and Montalva down to the present time."

But we are of opinion that since the right of the government of the United States to institute such a suit depends upon the same general principles which would authorize a private citizen to apply to a court of justice for relief against an instrument obtained from him by fraud or deceit, or any of those other practices which are admitted to justify a court in granting relief, the government must show that, like the private individual, it has such an interest in the relief sought as entitles it to move in the matter. If it be a question of property a case must be made in which the court can afford a remedy in regard to that property; if it be a question of fraud which would render the instrument void, the fraud must operate to the

prejudice of the United States; and if it is apparent that the suit is brought for the benefit of some third party, and that the United States has no pecuniary interest in the remedy sought, and is under no obligation to the party who will be benefited to sustain an action for his use; in short, if there does not appear any obligation on the part of the United States to the public, or to any individual, or any interest of its own, it can no more sustain such an action than any private person could under similar circumstances.

In all the decisions to which we have just referred it is either expressed or implied that this interest or duty of the United States must exist as the foundation of the right of action. Of course this interest must be made to appear in the progress of the proceedings, either by pleading or evidence, and if there is a want of it, and the fact is manifest that the suit has actually been brought for the benefit of some third person, and that no obligation to the general public exists which requires the United States to bring it, then the suit must fail. In the case before us the bill itself leaves a fair implication that if this patent is set aside the title to the property will revert to the United States, together with the beneficial interest in it. It is argued in the brief that this is not true; that in fact the government is but the instrument of one Baker, who married the widow of Abel Stearns; and that Stearns contested the correctness of this survey with others before the land department very actively and energetically, because he had such an interest in the land covered by it that if it was defeated he would become the equitable or beneficial owner of the land. This view is supported by some pretty strong testimony and by the fact that Baker was the man at whose instance the action was begun.

When the Attorney General required that a bond should be given to save the United States harmless with regard to the costs of these proceedings, Baker was the man who furnished the security and signed the bond himself. The condition inserted in that obligation recited " that whereas the Attorney General of the United States of America has this day filed, *at the request of the above-named R. S. Baker*, a bill in equity in

the name of and on behalf of the United States of America against the San Jacinto Tin Company: . . . Now, there- fore, if the said Baker shall well and truly save the United States of America harmless from all costs and expenses which may be incurred by or against them in the prosecution of said suit to its final determination, and pay or cause to be paid on demand all such costs and expenses as may necessarily be in- curred in such prosecution, then this obligation to be void." Taking all these circumstances together, it raises a very strong implication that Baker expected that if the patent was set aside his right to the land covered by it, or to a large part of it, would become paramount.

But we are not so entirely satisfied of the want of interest of the United States in the whole or a part of the land which is covered by this patent as to justify us in saying that the bill in the present case ought to be dismissed on that ground.

Coming to the merits of the case, which turn exclusively on the question of fraud in the location of the survey of the grant to the original claimant, we are to observe that the issue is, by the pleadings themselves, as well as by the explicit statement of counsel for appellant, limited to actual fraud in the execu- tion of that survey. There is no denial of the validity of the original grant, nor of its confirmation by the land commission, as well as on appeal by the District Court of the United States for California and by this court. The justice of a claim for eleven square leagues of land within the surplus, technically called "sobrante," of the San Jacinto tract, is not questioned; nor does the decree which is to be carried out by this survey limit the location of the land otherwise than that it shall not be more than eleven leagues, and that it shall be within the outboundaries of this surplus.

There is a statement in the decree that the measurement of the land thereby confirmed is to be commenced from the line of the Estudillo grant as fixed by the act of judicial possession to him, to which reference is made. We consider this last description as nothing more than a statement that the land of Estudillo previously granted within the boundaries of the tract called San Jacinto shall be one of the boundaries of the

claim thus confirmed, and that the survey must not cover the grant to Estudillo. Reference is also made to a map contained in the expediente among the papers before the court.

The question presented would naturally divide itself into two parts, if there had been any allegation of an unintentional or accidental mistake in the location of the grant; but the plaintiffs in this case place themselves outside of the benefit of this claim of mistake except as it may be so gross as to aid the belief of an intentional fraud on the part of those who made it. The main issue, therefore, in the case is on the question of actual fraud committed by those who made and established the survey.

The principal foundation on which this fraud is rested by counsel is, that all the officers of the government below the Secretary of the Interior who had anything to do with the making, considering, confirming, or ratifying of this survey were interested in the claim; that the motive of the fraud was to include within the survey certain lands which were then known to contain mineral ores, believed to be immensely valuable; and that for this purpose the survey was distorted and wrenched from its proper place in order to cover these mineral deposits. As will be shown hereafter, most of the persons charged with having such interest, and with being in position to influence the location of the land by the surveyor, never had any interest in it at all until after the survey was made and confirmed and the patent issued to the claimant. If this be true, of course they were under no temptation to do wrong, and the fraudulent motive attributed to them could have had no existence.

Mr. Edward Conway, who had previously bought the property and received the conveyance of the title from the claimant before the patent issued, asserts in his testimony that at the time the survey was made and was pending before the Land Office he was the only owner of the property, and that no one had any interest, equitable or otherwise, in it but himself. After this he organized a corporation, to which the title of the property was conveyed, which undertook to work the tin mines found upon it, and most of these persons so

liberally charged with fraud in the survey are those who became stockholders therein.

The main instrument of this fraud, according to the theory of plaintiff's counsel, was Conway, who it is charged owned the whole or at least the predominating interest in the grant at the time the survey was made. At that time he was chief clerk in the office of the Surveyor General of the United States for California, and during the period when it was under consideration therein, as well as in the General Land Office and before the Secretary of the Interior. It is charged that he was often the acting Surveyor General, and that this survey was made under his control and direction while he was thus interested as owner of the claim.

It is also charged that George H. Thompson, a deputy surveyor, acting under the Surveyor General and said Conway, intrusted with the duty of making this particular survey, was also interested in the claim with Conway, as well as one Hancock, at some time a clerk in the Surveyor General's office. It is asserted further that the survey was not actually made upon the ground, but as a matter of fact in the office of the Surveyor General by said Conway, Thompson, and Hancock, solely for the purpose of surreptitiously securing letters patent upon the land described and included in the survey and plat, the motive in mislocating said land being that these parties believed that the land so surveyed contained valuable lodes of tin and other mineral ores.

The deposition of Conway was taken during the progress of the suit. He was then sixty years old. He states in that deposition that at the time it was given he had no interest whatever in the San Jacinto Tin Company, or in the lands which were the subject of controversy; that he had long since parted with his shares in the stock of that company, some of which were sold for assessments which he was unable to pay. He gives a history of his connection with the claim, and with the land office during its pendency before it, and also states the connection that other parties sustained to this transaction who are asserted to have been interested in it during that time. It seems to be a fair and candid statement of all the

facts about which he was interrogated. He contradicts himself nowhere during a long examination and cross-examination, and he is not anywhere successfully contradicted by other testimony in the case. He appears to have been sincerely anxious to tell the whole truth, and if his statement is to be believed he had no interest to do otherwise.

Mr. Conway states that during the years 1864, 1865, and 1866 he was chief clerk in the office of the United States Surveyor General for California, in San Francisco; that he entered that office in the fall of 1857, resigned in December, 1866, and again entered it on January 1, 1868, and remained there until December, 1869, his longest service being as chief clerk, although he commenced at a lower grade. He served under Surveyors General Mandeville, Beale, and Upson, and during the entire terms of the two latter with the exception of the year stated. He testifies that the approval of surveys could only be made by the Commissioner of the General Land Office, who was furnished with the field-notes and plats which were certified to be correct by the Surveyor General, who also made a report of his action for the approval or disapproval of that officer; that the first connection he had with the sobrante San Jacinto Viejo y Nuevo was in 1863; that he then told Surveyor General Beale that he wished to resign his place as chief clerk, as he had offers of other business, amongst which was one from Mr. Hancock, then a major in the army of the United States, who informed him that he had control of this sobrante and also of the Rancho San Jacinto Nuevo — that is, of the metals that were in those ranchos — and he wished him to take charge of the business.

Throughout the whole of this story the early connection of Hancock and Conway with the sobrante claim seems to have been under a right purchased by Hancock from Mrs. Aguirre of the mineral products thereof, without any claim to a general grant of the land. The witness Conway says that Surveyor General Beale told him, upon being informed of the above facts, that they constituted no objection to his remaining in the office, and that he did not wish to part with him. He says: "I told him I felt a little delicacy about it, and he

answered that he would look out for the interest of the United States. When Surveyor General Upson came into office I informed him of the circumstances; that I was interested, not in the rancho, but in the veins of metals that were supposed to be there; told him that I wished to have nothing to do with the survey — to have no connection with it — and any reports he wished on the matter he must get from other officers. In April, 1866, the owner of the sobrante offered it for sale for $8000; I think it was $3000 cash and $5000 on time on a mortgage."

He then went on to state that he enlisted Mr. Charles Hosmer, who advanced him the money for the cash payment, and he, Conway, then agreed to hold in trust for him one-eighth of the estate and repay him his advance out of the first proceeds; that the survey of the sobrante was made in 1864 at the request of the grantee, through her attorneys, Patterson and Stow, acting under the authority of Major Hancock, and in regard to this transaction he testifies as follows:

"Edward F. Beale was the Surveyor General at the time, and he issued the instructions for the survey. The deputy who was directed to make the survey of the sobrante was George H. Thompson. Neither Surveyor General Beale nor Thompson had any interest, present or contingent, in the sobrante at that time, or any promise of any interest. I know positively that they had no interest or promise of interest. Surveyor General Beale has never owned any interest in the sobrante rancho, nor ever owned any stock in the San Jacinto Tin Company, either by himself or in trust, or in any other manner. The survey was made by Thompson in Beale's time and under his instructions."

It further appears from his testimony that the survey having been forwarded to the department at Washington, it was there decided that the act of June 2, 1862, 12 Stat. c. 90, 410, under which the survey was made did not apply to California, and it was returned to the office in San Francisco, with instructions, the act of July 1, 1864, 13 Stat. c. 194, 332, having been passed in the meantime, to have it advertised according to the provisions of that statute. By this act the survey and its plat

and field-notes were to be open for public inspection for ninety days after the expiration of the four consecutive weeks of publication which was provided for; then if objections were made to the survey within that time by any party claiming to have an interest in the tract embraced by it, or in any part thereof, they were to be reduced to writing, stating distinctly the interest of the objector, and signed by him or his attorney, and filed with the Surveyor General, together with such affidavits or other proofs as he might produce in support of the objection; and at the expiration of said ninety days the Surveyor General was bound to transmit to the Commissioner of the General Land Office at Washington a copy of the survey and plat, with the objections and proofs filed in support of them, and also copies of any proofs produced by the claimant, all of which the Commissioner was to examine into, and approve the survey or return the same for correction. All this Conway testifies was done. He says: "Exceptions were taken to the survey by Abel Stearns, the owner of the Sierra Rancho on the north, and of the rancho that he claimed as the Temescal on the west. Surveyor General Upson ordered the survey reformed in order to leave space on the north for the Sierra, according to the juridical possession, of one league in width from the Santa Ana River." In all this the witness is confirmed by the records of land offices.

The witness stated that he took no part whatever in these proceedings with reference to either survey, and upon being asked if he exercised any control with respect to this sobrante claim or the survey thereof, said: "I simply gave notice to the Surveyors General, Beale and Upson, of my interest in this rancho, and after that I had nothing to do with it. The report was made by Mr. Hopkins, and I acted in the same manner as a judge would on the bench if he was interested in the case — step down and out." He also says that the instructions in regard to the mode of executing the survey came from the Commissioner of the General Land Office.

The witness then proceeded to state the facts connected with his acquisition of this property, as follows: 

" I made my first purchase of an interest in this sobrante on

the 3d of April, 1866, the only purchase I made; . . . I purchased it from Manuel Ferrer and his wife, Maria del Rosario Estudillo de Aguirre. She was the original grantee of the rancho. Her husband joined with her in the deed. No person was interested with me in that purchase, either before or upon the receipt of the deed, except Mr. Hosmer, as I before stated. That was the only interest except my own. I had that deed recorded in the office of the county recorder of San Bernardino County on the 30th of April, 1866. From April 3d, 1866, until April 30th, 1866, I was in San Francisco. The deed was executed in San Diego and sent up to me, and I sent it down for record immediately. . . . In addition to myself and Mr. Hosmer, no person except Jeremiah S. Black and William H. Lowery, attorneys-at-law, of Washington, were interested in that sobrante subsequent to the date of that deed, April 3, 1866, and prior to the date of that patent."

This was the period during which the survey was pending in the office of the Commissioner having charge of public lands, awaiting his approval, and witness says that during that period no interest in the sobrante was held in trust for any other person, to his knowledge, except those mentioned; that Black and Lowery were his attorneys in the case of the Rancho Sobrante San Jacinto before the Commissioner of the General Land Office, and the Secretary of the Interior, and the consideration which they paid for the interest which he, Conway, held for them was their service as attorneys in the matters mentioned. He further says that he resigned his position in the Surveyor General's Office about December 10, 1866, and proceeded to Washington, returning in December, 1867. He then goes on to recount his acquaintance in that city with Joseph H. Wilson, Commissioner of the General Land Office, and several other persons mentioned, and to deny that either or any of them were interested with him in any manner whatever in the sobrante, by purchase or otherwise, directly or indirectly, before his return from Washington on that occasion. He proceeds to say in the further history of the matter that when he returned from Washington, in December, 1867, he thought it best to form a corporation for the

purpose of working the ores in the mines, and offered interests to gentlemen whom he thought responsible, and calculated to further the joint interests of the corporation; that on the 3d day of January, 1868, the corporation was formed, and became the owner of the property; that it agreed to pay off the mort-gage, assume the indebtedness to Hosmer and pay him, Con-way, $7500, and allow him to retain a certain number of the shares of its stock, which he afterwards states to be about one-sixth of the sum at which it was capitalized; and that all, this was done.

Mr. R. C. Hopkins, who is charged as interested in this property and contributing to the successful fraud in the loca-tion of the land in controversy, states in his deposition that he was then sixty-seven years of age; that he was in the office of the United States Surveyor General for California from 1855 until 1879, having charge of the Spanish archives, which included the records of the grants made by the governments of Spain and Mexico. Of this witness it may be generally stated that he was shown to be a man of very high character, exceedingly useful to the government on account of his familiarity with and control of these valuable documents, and very much relied on by all persons interested in the location of surveys in that country or in the validity of Mexi-can grants.

In regard to this particular transaction he states that he was in that office, in the capacity of keeper of the archives, in 1864, when the survey was made which is the subject of con-troversy, at which time Mr. Beale was Surveyor General; that he saw the written application made by Hancock, through Patterson, for a survey of the rancho at that time, and proba-bly wrote the instructions for it to be made. Upon being asked who was the deputy surveyor who made the survey, he said that it was George H. Thompson. He was then asked, " By whom was he selected?" to which he replied, "I don't know, but I presume that the Surveyor General appointed him on his own motion;" and proceeded to say that the instructions were signed by the Surveyor General. He was then asked, " Was there any person in the Surveyor General's

office at that time who had any interest in this grant?" to which he replied, "To my knowledge, no." The inquiry was then made, "Do you know of any reason, object, or purpose in locating that grant on the part of anybody in the office other than to locate it according to the decree of confirmation?" to which he answered, "I do not." "Had you any interest in this matter before the issuance of patent?" To this he replied, "No, sir; neither directly nor indirectly." He was then asked if either Upson or Beale, the Surveyors General, or Wilson, the Commissioner of the General Land Office, or Thompson, the deputy who made the survey, or Whiting, had any interest in the claim prior to the issuance of the patent; to which he answered in each case that they had not.

He was afterwards interrogated about some shares of the stock of this company, which, he said, he had accepted from Conway as a sort of compensation for previous losses in other speculation, and upon which he paid large assessments and finally gave them up because he was unable or unwilling to continue the payments required. Hancock, Upson, and Wilson, he states, are dead.

He also testifies, that, with the fullest knowledge of the surveys and papers, and after an examination of the records in the office at San Francisco, it seems to him that it would be impossible to attempt to locate the rancho in any other way so as to conform to the decree of the court, and that this land is located within the general limits of the tract called San Jacinto, and did conform to that decree. Upon being asked if it was possible for him to be mistaken about this matter, he replied: "I don't think so; it is a question of landmarks that are unmistakable in their location, having historical names; it is hardly a matter in which judgment is to be much exercised, but is a matter of fact; at least, I looked upon it at that time as such, when I made this report." To the question, "Was that location made arbitrarily, without reference to courses or distances, or under the direction or dictation of Conway?" he answered: "I think it was made under the instructions of the Surveyor General; I presume, without any dictation from any one. There were probably some instructions to follow,

when public lands were · surveyed, the lines of the public
·surveys. . . . That survey, I presume, was made in ac-
cordance with the decree of the District Court, and with all
the data that could be obtained."

It appears also that Hopkins made the report of the survey
to the Surveyor General, and that he does not doubt that it
was correctly made.

The deposition of Thompson, the deputy who made the
survey, was taken, and his examination of several hundred
pages is mainly confined to his acts in regard to it and the
means which he had for making it correctly.   On this branch
of the subject it is sufficient to say that his statement is very
clear to the effect that the survey was properly located,
although he admits that he did not go upon the land but
made the location, under directions from the Surveyor Gen-·
eral, from maps in his office showing the actual objects which
constituted the outboundaries of the sobrante and the other
locations which had priority to this.

During his examination he was asked what he knew about
the ownership of the claim at the time the surveys were made.
To this he replied in effect, that he did not know Conway
was the owner; that he understood the request for the survey
proceeded from Hancock, or from · attorneys employed by
Hancock, who represented the grantee in the decree of con-.
firmation.   He nowhere intimates, nor was he at any time
asked, whether he had an interest in the survey at that time,
and there is in fact a total failure to establish the allegation
that he had any interest whatever, either present or prospec-·
tive, in the claim when the survey was made by him, or was
influenced by anybody who had.

Without · going farther into the minutiæ of the testimony
on this subject, we are of opinion that there is no evidence
that establishes any interest in the claim under consideration
prior to the issuance of the patent in any man who was
connected with the land department of the government,
whether as Surveyor General, deputy surveyor, clerk, or other-
wise, except Conway; that Conway's interest was well known
to the Surveyors General, who at different times had charge

of this matter, as well as to the Commissioner of the General Land Office, and the Secretary of the Interior who finally passed upon it, and that he abstained from any interference with the making of the survey or the officers who had it in charge, except that probably while he was in Washington he looked after its confirmation.

The attempt to deduce an inference of fraud, in the establishment of this survey and the final issue of the patent, from the circumstance that, after its issue, and when Conway had become the sole owner of the property, he with many other persons of distinction, some of whom were engaged in other branches of the government service, and some connected with the land department, coöperated to organize a joint stock company for its development and improvement, the shares of which they took and upon which they paid many assessments, and from the further fact that a very few of them may have received such stock as compensation for aid rendered to Conway in his struggle to establish the title is, we think, entirely repelled by the testimony, which shows that none of these persons had any interest in it at the time the fraudulent transactions are alleged to have occurred. It does not appear that the stock which they got was in any sense a compensation for services rendered in establishing the survey, except in the case of Black and Lowery, who were the attorneys employed for that purpose and received some of its shares as their compensation. To hold that these parties, such as Hopkins, Thompson, Upson, and perhaps others, when they found the stock of a corporation for sale which had promise of profit in it, by taking its shares became *participes criminis* in a conspiracy to defraud the government, of which they knew nothing at the time the fraud is alleged to have been committed, and that the mere fact of their taking these shares of stock is evidence they took part in the conspiracy, is a species of logic on which patents granted by the United States should not be set aside.

We do not hesitate to say that there is a total failure of evidence to establish any participation in this fraud on the part of any of the persons in the service of the government,

who are charged with having been engaged in it. While we do not wish to give countenance to the idea that an officer of the government, before whom any matter may come for his action, or to be acted upon in his office, should voluntarily acquire an interest in such matter, even though he disclose that interest, but, on the contrary, think that he should accept no such delicate position; nevertheless that circumstance alone should not be permitted to divest the rights of others, unless it be shown that such position was used in aid of an actual fraud.

As to Conway, who had the principal, if not the sole, interest which could induce an effort to secure the false location of the grant, there is no sufficient evidence in the record to show that he undertook in any way to control the actual survey of this land. His testimony, given at a time when he could have had no pecuniary interest in the result of this suit, and delivered with a candor and apparent readiness to answer promptly all questions put to him, without any of the evasive expressions, such as, "I don't know," or "I cannot remember," so commonly used by false witnesses, commands our confidence.

The strongest argument against the commission of any fraud, and in favor of the correctness of the location of the grant by the survey, is to be found in the fact that it went through all the different offices in the land department to which it could possibly be taken, from its being filed by Thompson in the office of the Surveyor General up to its consideration by the Secretary of the Interior himself, and in all these offices ample time was given for careful examination, and an actual scrutiny of the matter was made by reason of the contest of Stearns, who succeeded in having the lines of the survey changed, so as to exclude property in which he was interested. After this change was made, it was again brought before the Commissioner and argued by counsel on both sides, and considered in the light of all the facts which either party chose to bring before the office, and abundant time was given for its investigation. Mr. Wilson, the Commissioner, was a man of many years' experience in the class of cases to which this belongs, and which he was then called upon to decide. He made a full

report, which is in the record, to the Secretary of the Interior, Hon. O. H. Browning, a lawyer of eminence and a man accustomed to weighing testimony, who, after having the case under consideration from May 22, 1867, to October 19 of the same year, made the following decision, which he referred back to the Commissioner of the General Land Office for execution:

"Sir: I have received your letter of the 22d May last, submitting for consideration the papers of the private land claim in California known as the 'Sobrante de San Jacinto,' and asking for instructions on the 'application for a patent to issue in accordance with the survey approved by the Surveyor General of California.' A careful examination of the papers and consideration of the arguments of counsel have led me to concur in your opinion that all the requirements of the law have been complied with, and that [the] patent should issue in accordance with the survey."

We consider this examination of the case in the office of the Commissioner and its reëxamination by the Secretary of the Interior as possessing the very strongest probative force in regard to the question of fraud, which was mooted before them, as well as the question of the proper location of the grant. No stronger evidence could be given of the honesty of Commissioner Wilson and his belief in the correctness of the survey than the fact of his reference of the whole matter to the Secretary of his own motion without any appeal by either party from his decision. They had in the Land Office abundant materials for the investigation of all the matters in dispute; they had before them the interested parties, with all the evidence which they could collect, the records, the Mexican archives and control of all the papers of the government since the territory came into the possession of the United States, as well as ample time, more than this court has, to consider all these subjects. Very little that is new or that throws any light upon the questions at issue is now produced on the hearing of this case.

With regard to the question of fraud, we have no hesitation in saying that there is no such case made of intentional fraud, or actual fraud, committed upon the government of the United

States in this transaction as justifies the cancellation of the patent. We have quite recently given our views upon this subject very freely in the *Maxwell Land Grant Case*, 121 U. S. 325, in regard to the character of the testimony necessary to set aside such a solemn instrument as a patent of the United States. It was there held, p. 381, "that when in a court of equity it is proposed to set aside, to annul, or to correct a written instrument for fraud or mistake in the execution of the instrument itself, the testimony on which this is done must be clear, unequivocal, and convincing, and that it cannot be done upon a bare preponderance of evidence which leaves the issue in doubt. If the proposition, as thus laid down in the cases cited, is sound in regard to the ordinary contracts of private individuals, how much more should it be observed where the attempt is to annul the grants, the patents, and other solemn evidences of title emanating from the government of the United States under its official seal."

So far from there being the satisfactory evidence here pointed out of a fraud against the government having been perpetrated in this case, there is really little but suspicion, fierce denunciation, and a bitter use of such words as "fraud," "deceit" and "imposition." If the case stood alone upon the testimony introduced by the government it would, so far as any fraudulent purpose is concerned, do but little more than raise a suspicion that the parties engaged in the transaction sought their own interest at the expense of the government, and not always by the most appropriate means; but when the testimony for the defence is considered it refutes, not only the existence of any such fraudulent intent or dishonest acts, but it removes from the main actors in the matter even the suspicion of having used underhand and improper means for the accomplishment of their purposes.

As regards the correctness of the location by survey of the grant, whose validity and justice is not questioned, we do not know that we can do better than to copy the language of the circuit judge presiding when the decree was rendered. In his opinion delivered on that occasion, and concurred in by the district judge, he said: "It is confidently assumed on the part

of complainant that the location of the lands patented is palpably wholly outside of the exterior limits described in the original petition, Mexican grant, and the decree of confirmation; that this is so obvious that the grant must have been wilfully and fraudulently located where it is. This is an assumption that, in our judgment, is wholly without justification in the documentary and other evidence in the case. Upon a careful consideration of the subject we are of the opinion that the most that can be reasonably said against the location is, that the record presents a fair case for an honest difference of opinion; that a plausible argument can honestly be made in support of either side of the proposition. An erroneous location is certainly not so obvious as to necessarily stamp it as a fraud."

When we consider the greater facilities possessed by the land department of the government for ascertaining the true location, and their superior fitness for deciding questions pertaining thereto, over those of the judicial department; and when we also remember that this location underwent the scrutiny of the officers in the office of the Surveyor General for California, as well as those of the General Land Office at Washington, and even of the Secretary of the Interior himself, and was finally approved by them all, we are not disposed to make further inquiry as to whether the location was in all respects in exact accordance with what it might possibly be if a resurvey were made under the additional light, if any, now thrown upon the subject.

The result of all these considerations is, that

*The decree of the Circuit Court is affirmed.*

MR. JUSTICE FIELD, concurring:

I concur in affirming the decree of the court below dismissing the bill in this case. The bill was filed to set aside a patent of the United States issued to Maria del Rosario Estudillo de Aguirre, and her heirs, for land situated in Southern California, in what is now known as San Bernardino County, granted to her by the Mexican government. The grant was

of the sobrante, or surplus lands remaining within the bounda
ries of a tract called San Jacinto, after satisfying two previous
grants. The claim under it was presented to the Board of.
Land Commissioners created by the act of Congress of March
3, 1851, 9 Stat. 631, c. 41, to ascertain and settle private land
claims in California, and was adjudged to be valid to the ex-
tent of five leagues. On appeal to the District Court of the
United States for the Southern District of California, the
claim was confirmed to the surplus land lying within the des-
ignated boundaries, not exceeding in extent eleven square
leagues. The case being brought to this court, the latter
decree was affirmed. The judgment here was rendered at the
December term, 1863. Then followed a protracted contest,
accompanied with much feeling, for the location of the claim.
There being within the San Jacinto tract a tin mine, then sup-
posed to contain a rich body of metal, every step in the survey
was contested. Witnesses were examined, and repeated argu-
ments made by counsel representing the parties for and against
the location sought. As there were no boundaries of the
sobrante marked, by which the claim could be specifically des-
ignated, much was left to the judgment of the Surveyor Gen-
eral, after having examined the topography of the country,
and heard the statements of witnesses familiar with it. The
limitation made by the grant itself only required that the
claim should be located within the exterior boundaries of the
San Jacinto, and not encroach upon the land covered by
the previous grants. In the determination of the survey and
location several years were occupied. The matter was at dif-
ferent times before all officers of the Land Department whose
judgment could control any of the several steps of the pro-
ceedings, the United States Surveyor General for the State,
the Commissioner of the General Land Office, and the Secre-
tary of the Interior. Every objection now urged against the
survey as ground for revoking the patent was taken before
them, fully argued, and held to be untenable. At length, on
the 26th day of October, 1867, a patent was issued to the
claimants, from whom the defendant, the San Jacinto Tin
Company, derives its title.

Separate Opinion of Mr. Justice Field.

In April, 1883, after the company had been in possession of the property for nearly sixteen years, and after all the other land within the exterior boundaries of the San Jacinto tract had been patented to the previous grantees, or sold by the United States, so that if the location and survey, on which the patent was issued, could be set aside, there would be no land left to satisfy the grant without annulling titles which the United States had conveyed to other parties, this suit was brought. And it was not brought upon any new fact produced, nor any new reason assigned why the original survey should be disturbed. All the grounds of complaint presented for the new litigation had been urged, and fully considered before. And as if convinced that no beneficial result could come to the United States from the reopening of the old controversy; as if afraid that the United States might be cast in the litigation, a bond was taken from one R. S. Baker, with sureties, to keep the United States harmless from all costs and expenses which might be incurred by or against them in the prosecution of the suit. The original contest upon the survey was carried on, and the expenses of it borne, by one Abel Stearns. Since his death this R. S. Baker married the widow of Stearns, and has sought to retry the issues as to the survey which were decided and determined in the Land Department years before, when Abel Stearns was living. The bond recites that "the Attorney General of the United States of America has this day filed, at the request of the above named R. S. Baker, a bill in equity in the name of and on behalf of said United States of America against the San Jacinto Tin Company" to vacate the patent. Not for the interest of the United States, not for the protection of their property, or to vindicate their honor, but at the request of a private litigant, the name and power of the United States are invoked by the Attorney General to set aside a patent issued after a protracted contest upon the survey with the predecessor of this litigant.

If this were a solitary instance where the name and power of the United States have been used to serve the interests of private parties, it might be passed by with the simple statement of the facts. But, unfortunately, it is not a solitary

instance. The records of this court show that it has been a frequent practice of the Department of Justice in authorizing suits for the cancellation of patents. In *United States* v. *Throckmorton*, 98 U. S. 61, which was here at the October term, 1878, it appeared that the District Attorney of California was directed by the Attorney General to bring suits to vacate patents for lands in that State, upon security being given by one John B. Howard, or a deposit made by him of a sufficient sum to defray the expenses which might be incurred in the litigation; and the bills filed upon such authority were not sworn to, nor even authenticated by the signature of the Attorney General. In this case the bill bears the signature of the Attorney General in office at the time it was filed. His signature gives some assurance, which was wanting in the *Throckmorton* case, of his belief in its allegations, and that the suit is really brought by the United States to protect their rights, and not merely to promote the interests of private individuals. In that and other cases, brought on the authority of the Attorney General, the patents embraced many thousand acres of land, and one of the judges holding the Circuit Court observed that: "It is not to be supposed that if the Attorney General were persuaded that so large and valuable a property belonged to the United States he would have made the assertion of its rights to depend upon the willingness or ability of private individuals to defray the expense of the litigation." *United States* v. *Flint*, 4 Sawyer, 42, 83. In the present case the bill seeks, by setting aside a patent of the United States, to restore eleven leagues of land to the public domain. And yet, so doubtful did the Attorney General appear to consider the rights of the United States to this vast tract, that he required from the party, at whose instance the suit was brought, a bond of indemnity against the expenses of the proceeding.

In commenting upon a similar bond, when the case of *Throckmorton* was here, the court, speaking by Mr. Justice Miller, said: "It would be a very dangerous doctrine, one threatening the title to millions of acres of land held by patent from the government, if any man who has a grudge or a claim

against his neighbor can, by indemnifying the government for costs, and furnishing the needed stimulus to a district attorney, institute a suit in chancery in the [name of the] United States to declare the patent void. It is essential, therefore, to such a suit, that, without special regard to form, but in some way which the court can recognize, it should appear that the Attorney General has brought it himself, or given such order for its institution as will make him officially responsible for it, and show his control of the cause." p. 71. And yet this requirement does not seem to have been potential enough to induce such an examination of the rights of the United States as to justify in the present case the attempt to enforce them without security from private parties.

I cannot admit that the Attorney General can, at the request of private parties, rightfully allow the use of the name and power of the United States in proceedings for the annulment of patents, upon such parties executing a bond as security for costs, or upon any other stipulation of indemnity to them. If the United States have not sufficient interest in property to justify the expenses of proper litigation for its maintenance, they had much better let it go. It would seem that Congress designed to put its mark of condemnation upon the practice of obtaining services from private parties, without incurring liabilities for them, such as was adopted in this case, when, on May 4, 1884, it declared that "hereafter no Department or officer of the United States shall accept voluntary service for the government, or employ personal service in excess of that authorized by law, except in cases of sudden emergency involving the loss of human life or the destruction of property." 23 Stat. 17, c. 37. The language here used clearly indicates that the government shall not, except in the emergencies mentioned, place itself under obligations to any one. The principle condemned is the same, whether the party rendering the service does so without any charge or because paid by other parties. The government is forbidden to accept the service in either case.

It is not to be supposed that any head of the Department of Justice has or would intentionally lend the name and power

of the government to further private ends, and yet there is no practical difference between that course of procedure and the one adopted in this case. The opinion of the court shows above all controversy the utter groundlessness of the charges upon which it is sought to set aside the survey. A very little attention to the proceedings had before the Land Department in the contest upon that survey would have satisfied the Attorney General of the futility of any attempt to disturb it, and it is not probable that he would have authorized any.

But independently of these considerations I cannot assent to the position announced in the opinion of the court, that the Attorney General has unlimited authority by virtue of his office to institute suits to set aside patents issued by the government. He is the head of the Department of Justice, and as such he is charged with the superintendence and direction of all district attorneys of the United States, and generally of all litigation in which the United States are interested. He is also the legal adviser of the heads of the executive departments, and if they are fraudulently imposed upon in the discharge of their duties, or have mistaken the law, he may at their request take such legal proceedings as are necessary to correct their errors and revoke their action. The legislation of Congress points out the infinite variety of cases where legal proceedings may be taken on behalf of the United States in the enforcement of their rights, the protection of their property, and the punishment of offences, and wherever no authority is conferred by statute express or implied for the institution of suits, none in my judgment exists. Whenever Congress has felt it important that patents for lands should be revoked, either because of fraud in their issue, or of breach of conditions in them, it has not failed to authorize legal proceedings for that purpose. In a multitude of cases titles to lands, upon which whole communities live, rest upon patents of the United States. In several instances, cities having more than a hundred thousand people residing within their limits are built on land patented by the government. I cannot believe that it is within the power of the Attorney General, to be exercised at any time in the future, this generation or the next — as no

statute of limitations runs against the government — to institute suits to unsettle the title founded upon such patents, even where there are allegations of fraud in obtaining them. There must be a time when such allegations will not be heeded. The examination into alleged frauds, when the patents are applied for, ought to close all controversy respecting them; clearly so, unless, upon newly discovered evidence of the most convincing character, Congress should direct proceedings to be instituted to set aside the patents, and that result can be obtained without impairing the title of innocent parties. The power of the Attorney General, if admitted when a single person holds title under a patent, may be exercised in cases where a whole community holds under a similar instrument. If, without the authority of Congress, such proceedings may be instituted by him upon the repetition, as in this case, of old charges, or upon the unsupported statements of interested parties, a cloud may at any moment be cast upon the titles of a whole people and there would be in his hands a tremendous weapon of vexation and oppression. I can never assent to the position that there exists in any officer of the government a power so liable to abuse and so dangerous to the peace of many communities.

I do not recognize the doctrine that the Attorney General takes any power by virtue of his office except what the Constitution and the laws confer. The powers of the executive officers of England are not vested in the executive officers of the United States government, simply because they are called by similar names. It is the theory, and I may add, the glory of our institutions, that they are founded upon law, that no one can exercise any authority over the rights and interests of others except pursuant to and in the manner authorized by law.

In the case of *The Floyd Acceptances*, 7 Wall. 666, 676, speaking of the powers of an officer of the government — in that case of the Secretary of War — this court said: "When this inquiry arises, where are we to look for the authority of the officer? The answer which at once suggests itself to one familiar with the structure of our government, in which all

power is delegated, and is defined by law, constitutional or statutory, is, that to one or both of these sources we must resort in every instance. We have no officers in this government, from the President, down to the most subordinate agent, who does not hold office under the law, with prescribed duties and limited authority."

If the Attorney General possesses the powers ascribed to him in the absence of any law defining them, we have this singular condition presented, that the owner of property derived from the United States by the most solemn instruments, holds his possession subject to the liability that it may be disturbed at any time by a suit of the government, brought at the will of that officer, a not very creditable commentary on our institutions; but if the owner can trace his title to some other source, he may have a reasonable degree of certainty that he will not be unnecessarily disturbed.

Aside from the qualifications thus expressed to the views of the court, there is much in the opinion which gives me great satisfaction. It holds that in suits brought by the government for relief against an instrument alleged to have been obtained by fraud or deceit, or any practice which would justify a court in granting relief, the government must show, like a private individual, that it has such an interest in the relief sought as entitles it to move in the matter. If it be a question of property, a case must be made in which the court can afford a remedy in regard to that property; if it be a question of fraud, which would render the instrument void, the fraud must operate to the prejudice of the United States; and if it is apparent that the suit is brought for the benefit of some third party, and that the United States have no pecuniary interest in the remedy sought, and are under no obligation to the party, who will be benefited, to sustain an action for his use; in short, if there does not appear any obligation on the part of the United States to the public, or to any individual, or any interest of their own, they can no more sustain such an action than any private person could under similar circumstances.

From this ruling some degree of peace and security may come to holders of titles derived by patent from the government.

From the clear and full statement, in the opinion of the court, of the case and of the controversies before the Land Department, involving the same questions now presented, there can be but one conclusion, and that is, that the decree below dismissing the bill was in consonance with justice and right.