394

## UNITED STATES v. HARTMANN.
### Civil Action No. 2620.

District Court, E. D. Pennsylvania.
July 23, 1943.

See, also, D.C., 2 F.R.D. 477.

Gerald A. Gleeson, U. S. Dist. Atty., and Thomas J. Curtin, Asst. U. S. Dist. Atty., both of Philadelphia, Pa., and Earl R. Larson, and Durward E. Balch, Sp. Assts. to Atty. Gen., for plaintiff.

T. Henry Walnut, and Francis Fisher Kane, both of Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

This is a civil action brought under Sec. 738 of the Nationality Act, 8 U.S.C.A., to revoke the order of this Court admitting the defendant to citizenship and for the surrender and cancellation of his certificate of naturalization. Decision was deferred, awaiting action by the Supreme Court of the United States upon the case of Schneiderman v. United States, 63 S.Ct. 1333, 1335, .87 L.Ed. ——. The opinion of the Supreme Court in that case, handed down June 21, leaves little need for the discussion of the general principles involved and the measure of proof required in cases of this kind.

■■■ The statute specifies two grounds —fraud and illegal procurement of the order and certificate—upon which denaturalization proceedings may be instituted. They are not mutually exclusive, though there may be illegal procurement without fraud. That was true in the Schneiderman case. There, the Supreme Court, in speaking of the rights of naturalized citizens, said: "But such a right once conferred should not be taken away without the clearest sort of justification and proof. * * * we believe the facts and the law should be construed as far as is reasonably possible in favor of the citizen. Especially is this so when the attack is made long after the time when the certificate of citizenship was granted and the citizen has meanwhile met his obligations and has committed no act of lawlessness." These words were intended to apply to attacks upon the right of citizenship on whatever ground, and it is not to be thought that the Supreme Court had in mind that less evidence would suffice in cases in which fraud is alleged than where it is not. The Supreme Court deduced the rule as to the necessary degree of proof, by analogy, from cases of proceedings to revoke public grants, in which cases (e.g. Maxwell Land-Grant Case, United States v. Maxwell Land-Grant Co., 121 U.S. 325, 7 S.Ct. 1015, 30 L.Ed. 949, and United States v. San Jacinto Tin Co., 125 U.S. 273, 8 S.Ct. 850, 31 L.Ed. 747) no distinction whatever was made, as to measure of proof, between fraud and illegality. The rule is that the evidence must be "clear, unequivocal, and convincing." The gravamen of the complaint in the present case is fraud, and I accept the Supreme Court rule as to measure of proof as fully applicable.

There is only one issue. That is whether this defendant on June 27, 1934, when he took the oath of allegiance, mentally reserved in whole or in part allegiance and fidelity to the Government of Germany. Upon that issue the evidence offered by the Government falls far short of being clear, unequivocal and convincing and of leaving the issue free from doubt. Indeed, since it represents my considered judgment, I think that this defendant is entitled to a finding that when he took the oath of allegiance he did in fact absolutely and entirely renounce and abjure all allegiance to Germany without reservation, and I so find.

The.facts of this case, in detail, will be found in the Court's answer to requests presenred by both sides. The Government's evidence was built mainly upon the defendant's connection with the German American Bund in 1936 and 1937 in the capacity of local leader of the Philadelphia group. Testimony was also offered as to his statements and conduct on several scattered occasions which, it was argued, indicated attachment or allegiance to Germany at the time they were made.

■■■ The last mentioned branch of the Government's case amounts to very little and, in fact, I am inclined to think that, were it not for the defendant's Bund connection, it would be conceded there would not have been sufficient evidence against him to justify this proceeding. One statement which was offered to show dislike of America on the part of the defendant was certainly misunderstood or misinterpreted by the witnesses. Another, upon which considerable stress was laid, was made, not by the defendant but in his presence by his wife and there is nothing to indicate that it represented his thought. According to the witness the defendant said nothing, but "just sat there very much disturbed and worried." There was evidence of antisemitism, the defendant on occasions used the greeting "Heil" (though he denied ever using "Heil Hitler"), and his little boy once gave a guest the Nazi salute. These instances all occurred prior to our entry into the war.

■■ The Government's contention that membership in the Bund, or at any rate an official connection with it, is in itself conclusive evidence from which the Court must find that the naturalization of the defendant was procured by fraud need not be

seriously considered. So far as I know, this view has not been accepted by any court and seems to have been entirely disposed of by the statement in the Schneiderman case, "where two interpretations of an organization's program are possible, the one reprehensible and a bar to naturalization and the other permissible, a court in a denaturalization proceeding, assuming that it can re-examine a finding of attachment upon a charge of illegal procurement, is not justified in canceling a certificate of citizenship by imputing the reprehensible interpretation to a member of the organization in the absence of overt acts indicating that such was his interpretation."

■ The published aims and purposes of the Bund as stated in its constitution and in much of its literature both official and unofficial are entirely consistent with loyalty to this country. It is unquestionably true, however, that many of the Bund leaders were wholly attached to Germany and the Nazi party and had dreams of developing a movement here that would come to achievement like Hitler's by like methods and with like results. The limited membership to which the exclusively Germanic character of the organization condemned it made any great progress in that direction unlikely in this country of mixed racial origins, but, as a fifth column, the Bund might have been a source of danger in time of stress. On the whole, I think that these activities within the organization were sufficiently widespread to justify the conclusion which Judge Bright reached in the New York cases that the constitution and outward forms of loyalty to the United States were or had become a mere front and that the aims and purposes of the Bund, considered as an entity, were un-American and subversive. However, as Judge Bright was prompt to say: "It does not follow * * * that mere membership in the Bund would be sufficient upon which to base the judgment here sought." United States v. Kuhn, D.C. 49 F.Supp. 407, 414. The evidence of the undercover aims and purposes of the Bund—the "reprehensible interpretation"—is relevant, but its value in this case depends upon whether the defendant knew, approved of or adopted those aims, and upon what can be inferred from it as to his state of mind when he took the oath of allegiance.

Having been naturalized in 1934, the defendant joined the Bund's predecessor organization in late 1934 or early 1935. So far as appears, when he was invited to become a member the social features of the organization were the only ones stressed. He attended no meetings for more than two years and took no interest in it until early in 1937. He resigned from membership about a year and a half later. From about August 1, 1937 until his resignation, about nine months later, he was the local group leader of the Philadelphia unit, the membership of which was between 150 and 200. He accepted the position, to fill a vacancy, only after some urging, and his selection seems to have been largely because of his knowledge of English and rather superior intelligence. For a few months after his resignation he maintained some sort of unofficial connection with the Bund, principally for the purpose of assisting his successor in office. After that, his only contacts were with the Deutschhorst Camp or Country Club—contacts not known to be other than business and social.

There is nothing to show that the defendant when he came to this country in 1927, had been in any way identified with the Nazi movement in Germany. He stated that at that time he had never heard of Hitler. A Government witness, offered as an expert upon Bund affairs and National Socialism in General, testified that in 1927 the party was not well known throughout all Germany; "for example in the Rhineland (the defendant's home) it wasn't very much known at all as it was in central."

Of course, during his active connection with the Bund, the defendant was undoubtedly exposed to propaganda, both official and unofficial, coming from Bund headquarters or appearing in its paper in articles, reports of speeches, etc., some of which can rightly be called un-American and subversive, but that is quite a different matter from saying that he endorsed or adopted these views. He expressed emphatic disapproval, in his testimony, of such as he believed contrary to the spirit of our constitution and laws.

The defendant's wife was never naturalized and has been interned as an enemy alien. It is plain that her sentiments, expressions and activities augmented the suspicion of disloyalty which fell upon the defendant as a result of his connection with the Bund. In his preliminary statement, offered in evidence, he said referring to his desire to conform to the principles of American citizenship, "between my wife and I through that fact came very big dif-

ferences and heartbreaking differences. \* \* \*".

Lastly I think I should say that the defendant, throughout his testimony on the witness stand, impressed me as truthful. He is an intelligent man and I found very little, if any, disposition on his part to evade or equivocate. He could have easily capitalized on his resignation from the Bund by pretending that he had become convinced that it was a disloyal organization and that he could not remain in it because its aims and principles conflicted with his obligations as a citizen. He said, however—it seemed to me quite frankly—that he was moved to resign by the fact that general disapproval of his Bund association (which culminated in a small riot at one of the meetings) caused him great annoyance, made it difficult for him to get along and threatened to cost him his job, and that when he left he was not convinced that there was anything wrong about Bund membership. This view, he testified, was confirmed by some communication from the New York office in answer to an inquiry of his, stating that the Bund had been investigated by the Government and given a clean bill of health.

For the reasons stated I am of the opinion that the prayer of the complainant should be denied and the complaint should be dismissed.