UNITED STATES *v.* BUDD *et al.*

(*Circuit Court, W. D. Washington.* August 20, 1890.)

1. PUBLIC LANDS—CANCELLATION OF PATENT.
  When the government of the United States applies for equitable relief, it must, like an individual suitor, do equity on its part. In a suit to cancel a patent for land on the ground of error in issuing it, when the patentee is not guilty of fraud, it is essential for the government to return the purchase money to the patentee.

2. SAME—SALE OF TIMBER-LAND.
  Within the meaning of the act of June 3, 1878, providing for the sale of timber-lands in California and other Pacific coast states, lands which had been offered at public sale, but not sold by the United States, and which were thereafter withdrawn from sale because situated within the limits of the land grant to the Northern Pacific Railroad Company, belong to the class of unoffered lands, and may be lawfully sold as timber-lands under said act.

3. SAME.
  The hilly, stony land, covered with fir and cedar forest trees, common in the western part of this state, are chiefly valuable for timber, and unfit for cultivation, within the meaning of said act, although the soil is not barren, and may be made to yield good crops after removal of the timber and stumps. The true interpretation of the act does not require the substitution of the word "solely" for the word "chiefly," nor do the words "unfit for cultivation" mean "not capable of being made fit for cultivation."

4. SAME—IMPROVEMENTS.
  The word "improvements," as used in said act, means valuable improvements. An abandoned and dilapidated cabin and remnant of an abandoned fence, which are of no use, are not such improvements.

5. SAME—FRAUD.
  The fact of a patentee of the United States having conveyed the land within one month after entering it in the land-office, and prior to the issuance of his patent to a vendee, who at about the time of said transaction also purchased other lands from a number of persons, who within a recent period entered the lands so conveyed by them, respectively, under the laws of the United States, is not a circumstance from which an inference, much less a conclusion, can be fairly drawn that there was an agreement between said patentee and his vendee, made prior to the entry, whereby the title to be acquired should inure to the latter; and, there being no evidence tending to connect said patentee with any conspiracy, no inference unfavorable to him can be drawn from evidence tending to prove that his vendee had received conveyances of other lands from other persons, made pursuant to agreements antedating entry of the lands.

6. SAME—RIGHTS OF PATENTEE.
  A purchaser from the United States, under the act above referred to, is not required to retain the land. After perfecting his right to it in good faith, the *jus disponendi* immediately becomes vested in him, and, in a suit to cancel a patent on the ground of fraud, without evidence of fraud on the part of the patentee other than above indicated, the prayer of the bill will be denied.

(*Syllabus by the Court.*)

In Equity.

*P. H. Winston,* U. S. Atty., and *P. C. Sullivan,* Asst. U. S. Atty.

*B. F. Dennison* and *Raleigh Stott,* for defendants.

HANFORD, J. The defendant David E. Budd acquired title by a patent from the United States to a tract of land described as the S. E. ¼ of section 12, township 9 N., range 1 W., Willamette meridian, situated in Cowlitz county, in this state, and by direction of the attorney general this suit to cancel said patent was commenced in the district court of the second judicial district of Washington Territory, holding terms at Vancouver, in which court the issues were made up, a trial was had, and a decree for the defendant was rendered. The cause was then removed

by an appeal to the supreme court of the territory of Washington, and was pending in the last-mentioned court and undetermined at the time of the admission of the state of Washington into the Union, whereby it was transferred to this court. The testimony introduced upon the trial in the territorial district court was stenographically reported, and, together with all the exhibits and documentary evidence, has been duly certified, and is now on file in this court. It is assumed by the court, because conceded by all the parties, that the case is now properly before the court for trial *de novo* upon the testimony and proofs appearing in the record, precisely the same as it would have been in the supreme court of the territory if the existence of that court had continued long enough for a hearing to have been had and a decision of the case to have been rendered therein. The patent which the government is here asking the court to cancel was issued under the provisions of the act of June 3, 1878, providing for the sale of timber-lands in California, Nevada, Oregon, and Washington Territory. Supp. Rev. St. 328. The first three sections of this act contain the provisions which are of importance in this case. They are as follows:

"Section 1. That surveyed public lands of the United States within the states of California, Oregon, and Nevada, and in Washington Territory, not included within military, Indian, or other reservations of the United States, valuable chiefly for timber, but unfit for cultivation, and which have not been offered at public sale according to law, may be sold to citizens of the United States, or persons who have declared their intentions to become such, in quantities not exceeding one hundred and sixty acres to any person, or association of persons, at the minimum price of two dollars and fifty cents per acre; and lands valuable chiefly for stone may be sold on the same terms as timber-lands: provided, that nothing herein contained shall defeat or impair any *bona fide* claim under any law of the United States, or authorize the sale of any mining claim, or the improvements of any *bona fide* settler, or lands containing gold, silver, cinnabar, copper, or coal, or lands selected by the said states under any law of the United States donating lands for internal improvements, education, or other purposes: and provided, further, that none of the rights conferred by the act approved July 26, 1866, entitled (1) 'An act granting the right of way to ditch and canal owners over the public lands, and for other purposes,' shall be abrogated by this act. And all patents shall be subject to any vested and accrued water-rights, or rights to ditches and reservoirs used in connection with such water-rights, as may have been acquired under and by the provisions of said act; and such rights shall be expressly reserved in any patent issued under this act. Sec. 2. That any person desiring to avail himself of the provisions of this act shall file with the register of the proper district a written statement in duplicate, one of which is to be transmitted to the general land-office, designating by legal subdivisions the particular tract of land he desires to purchase, setting forth that the same is unfit for cultivation, and valuable chiefly for its timber or stone; that it is uninhabited, contains no mining or other improvements, except for ditch or canal purposes, where any such do exist, save such as were made by or belong to the applicant, nor, as deponent verily believes, any valuable deposit of gold, silver, cinnabar, copper, or coal; that deponent has made no other application under this act; that he does not apply to purchase the same on speculation, but in good faith to appropriate it to his own exclusive use and benefit; and that he has not, directly or indirectly, made any agreement or contract, in any way or manner, with any person or persons whatsoever,

by which the title which he might acquire from the government of the United States should inure, in whole or in part, to the benefit of any person except himself,—which statement must be verified by the oath of the applicant before the register or the receiver of the land-office within the district wherein the land is situated. And if any person taking such oath shall swear falsely in the premises, he shall be subject to all the pains and penalties of perjury, and shall forfeit the money which he may have paid for said lands, and all right and title to the same; and any grant or conveyance which he may have made, except in the hands of *bona fide* purchasers, shall be null and void. Sec. 3. That, upon the filing of said statements, as provided in the second section of this act, the register of the land-office shall post a notice of such application, embracing a description of the land by legal subdivisions, in his office for a period of sixty days, and shall furnish the applicant a copy of the same for publication, at the expense of such applicant, in a newspaper published nearest the location of the premises, for a like period of time. And after the expiration of the said sixty days, if no adverse claim shall have been filed, the person desiring to purchase shall furnish to the register of the land-office satisfactory evidence, *First*, that said notice of the application, prepared by the register as aforesaid, was duly published in a newspaper, as herein required; *secondly*, that the land is of the character contemplated in this act, unoccupied, and without improvements other than those excepted, either mining or agricultural, and that it apparently contains no valuable deposits of gold, silver, cinnabar, copper, or coal. And, upon payment to the proper officer of the purchase money of said land, together with the fees of the register and the receiver, as provided for in case of mining claims in the twelfth section (2) of the act approved May 10, 1872, the applicant may be permitted to enter said tract, and, on the transmission to the general land-office of the papers and testimony in the case, a patent shall issue thereon: provided, that any person having a valid claim to any portion of the land may object in writing to the issuance of a patent to lands so held by him, stating the nature of his claim thereto; and evidence shall be taken, and the merits of said objection shall be determined, by the officers of the land-office, subject to appeal as in other land cases. Effect shall be given to the foregoing provisions of this act by regulations to be prescribed by the commissioner of the general land-office."

An examination of this statute shows that it was framed with great care, and that congress intended by its own provisions, and the regulations which it authorizes the secretary of the interior to make, to insure such publicity of all proceedings, and such delays and opportunities for investigation and deliberation, as to render frauds and evasions of its provisions certain of exposure before the acquisition of title to any tract of land could be finally completed under it by the issuance of a patent. It was after the affidavit required by the second section of the act had been made and filed by the defendant Budd, and after he had given the notice, furnished the proofs, made the payments, and suffered the delays required by the act, that the officers of the government issued to him this patent as evidence of a complete and perfect title. This court has the right, and it is its duty, to undo what has been done by the executive branch of the government by decreeing a cancellation of this solemn instrument, subscribed, as it is, by the name of the president, if sufficient grounds for doing so are shown to exist; but only for good and sufficient reasons, distinctly alleged and clearly proven.

The alleged grounds for canceling this patent are as follows:

(1) The land had been, at a time prior to the date of the statute, offered for sale; therefore the patent was issued unlawfully, as this statute only authorizes the sale of land which had not been, prior to its passage, offered for sale. (2) The land is not of the description to which this act applies, because not chiefly valuable for timber or stone, and unfit for cultivation, but is valuable for agricultural purposes; and the defendant Budd, in making his proof in the land-office, procured the giving of false testimony as to the character of the land in this respect. (3) The land was not subject to sale under this statute, because at the time of Budd's application to enter it there were valuable improvements upon it, not made by him, and he was guilty of procuring false testimony in this particular. (4) The defendant Budd, before he applied to purchase the land, had made an agreement with his co-defendant, Montgomery, to transfer to the latter the title which he should obtain, and he did not apply to purchase the land for his own use; and the affidavit which he made to the effect that he had not made any agreement or contract whereby the title which he should obtain should inure, directly or indirectly, to any person or persons other than himself was in these particulars false and forsworn.

It is a conceded fact that the township containing the particular quarter section of land now in dispute was surveyed by the government in 1863, and all of said township not claimed by actual settlers and filed upon was thereafter offered at public sale, under the land laws of the United States, and remained as offered land, subject to private entry at the minimum price of $1.25 per acre, until the 13th day of August, 1870, at which time it was withdrawn from sale in consequence of being situated within the limits of the grant to the Northern Pacific Railroad Company. It is also a conceded fact that a small portion of this particular quarter section, to-wit, about 15 or 20 acres, is prairie, and all the balance of it is forest, being covered with fir, cedar, and hemlock timber, and an undergrowth of vine, maple, sallal bushes, and all the various shrubs and plants usually found in the forests of the western part of this state; and it is further conceded that, at a time prior to the application to purchase this land by the defendant Budd, it had been settled upon by a man named Doherty, who constructed a small cabin for his habitation, and made some attempt to cultivate the small prairie above referred to. And the record shows that it is conceded that Budd's application to enter this land was made on the 23d day of August, 1882, and he made his proofs and paid for the land, and a receiver's receipt was issued to him, on the 10th day of November, 1882; and that on the 8th day of December, 1882, he executed and delivered a deed of the land to the defendant Montgomery, and the patent conveying the title to Budd was issued on the 5th day of May, 1883.

I have now stated the premises from which the necessary conclusions of fact and law are to be reached which shall determine the rights of the parties here involved, and will now proceed to consider severally, and in the order above set forth, the several grounds upon which the court is asked to do equity, and, as a matter of justice, to cancel this patent. In considering the merits of the first of the several grounds for canceling the patent, it is important to keep in mind that this is not like a proceeding to rescind a contract. The government has not offered to return

the money it received for the land; and, while it seeks to be restored to its original title and possession, it does not pray to have the parties on both sides placed in the position which they occupied before its officers and agents granted Budd's application to enter the land under this statute, and accepted his money. The case is prosecuted to secure an absolute forfeiture of all the defendants' interests in the land, as well as the money paid for it, and proceeded under the theory that whatever is illegal and wrong in the transaction is chargeable solely to the defendants. Now, if all that is claimed by the government as constituting the first ground for canceling the patent, both as matter of fact and of law, were conceded, the court would be unable to find any such fraud intended, or misconduct on the part of the defendants, as would afford either legal or equitable cause for the confiscation of their property. At most it is only claimed that this particular land, by reason of having been once offered at public sale, is excluded from sale under the act of June 3, 1878. If this is so, the sale of it to Budd under that statute was an error, but only an error, and one for which the officers and agents of the government are chiefly responsible; for upon them is cast the duty of administering the law according to its provisions, and of holding all persons seeking to obtain title to lands from the government to a compliance with the laws and regulations prescribed for the determination of their rights. When the government of the United States seeks relief from a court of equity, it is as much bounden as any individual suitor by the rules of equity. It can obtain such relief only when entitled to it upon principles of equity and good conscience. *U. S.* v. *White*, 17 Fed. Rep. 561; *U. S.* v. *Tin Co.*, 23 Fed. Rep. 279, and the same case 125 U. S. 273, 8 Sup. Ct. Rep. 850. It cannot, to correct a mere error in a transaction not tainted with crime or fraud, perpetrate so grave a wrong on its part as to deprive its adversary of valuable property or a sum of money without any compensation or equivalent therefor. If this were a suit between two private individuals, the plaintiff would not be equitably entitled to a rescission of his contract and restoration of his title to the land without first on his part repaying the purchase money which he had received; and by the same rules of equity and justice the right of the government to recover this land, and also to hold the purchase money paid for it, must be denied, unless a forfeiture of the defendant's rights on the ground of fraud or willful misconduct can be shown.

In addition to the above considerations, I hold that there was in fact no such error committed in allowing Budd's application under this statute as counsel for the government have claimed. I think a reasonable construction of the statute would limit the application of the words, "and which have not been offered at public sale according to law," to lands which at the date of the act belonged to the class of unoffered lands, as contradistinguished from what, in the practice of the land department, is known as "offered" lands; that is, lands which are subject to private cash entry at the minimum price. By the insertion of this clause in the statute no more was intended than to avoid the absurdity of making a law providing for the sale of land at the price of $2.50 per acre, under

prescribed limitations and restrictions, which, under existing laws, were already subject to sale at one-half that price, without the limitations and restrictions. So viewing the statute, as this particular tract of land had been withdrawn from sale at a time prior to the date of the statute, its *status* was at the date of that act that of unoffered lands; and if otherwise of the character described in section 1 was subject to sale under this statute, and the sale of it to Budd was lawful.

Most of the testimony introduced on the part of the government was directed to support the second proposition,—that is, as to the character of the land, whether it is in fact unfit for cultivation, and chiefly valuable for timber; and the efforts of counsel in the argument were mainly directed towards this branch of the case. In the argument it has been contended that a proper interpretation of the statute would exclude from entry and sale, under its provisions, all lands capable of being improved or redeemed from their natural unfitness for cultivation, and rendered capable of yielding crops of vegetation, grain, and fruit, and which have any element of value other than timber or stone; in other words, the court is asked to judicially determine that congress, by the use of the words "valuable chiefly for timber, but unfit for cultivation," in the first section of the act, and the words "unfit for cultivation, and valuable chiefly for its timber or stone," in the second section, failed to express the meaning intended, and that the reading of the act to express its true intent and meaning requires the rejection of those words, and the substitution in their place of such words as the following: "Unfit and incapable of being made fit for cultivation, and of no value except for timber or stone." In support of this contention, the opinion of Mr. Secretary Teller, in the case of *Spithill* v. *Gowen*, 2 Dec. Dep. Int. 631, has been cited, in which he says:

"This act contemplates such timber-lands as are found in broken, rugged, or mountainous regions, where the soil, when the timber is cleared off, is unfit for cultivation, and not lands, though heavily timbered, where the soil is susceptible to cultivation."

The act in terms makes no reference to broken, rugged, or mountainous regions, and does not allude to the condition of the soil, after the removal of the timber; and I am not aware of any rule or reason requiring the court to so construe the statute as to enlarge the limitation which it imposes, or narrow its application so as to exclude all lands in the states and territory named, except the inaccessible portions in the broken and mountainous regions. For the production of valuable timber, strength and fertility of the soil, and conditions favorable for the growth of vegetation, are necessary, and there are no timber-lands in this state which will not, after the removal of the timber, yield crops of vegetation, grains, and fruit, and there are no broken, rugged, or mountainous regions unfit for cultivation where valuable timber can be found; and to give the statute the construction contended for makes it a self-contradiction, and impracticable, and thereby nullifies it. It is plain, also, upon the face of the statute that congress intended that it should be understood according to the ordinary meaning of the words and phrases used.

The introductory words in the first section are "that surveyed public lands of the United States  *  *  *  may be sold.  *  *  *" This language of the statute itself carries a direct contradiction of the assertion made in the opinion of Mr. Secretary Teller, above cited, that the act contemplates such timber-lands as are found in broken, rugged, or mountainous regions. The act was made to go into immediate effect upon its passage, and by its terms it embraces and authorizes the sale of surveyed lands, which are not to be found in broken, rugged, or mountainous regions; for it is a matter of history in this country that settlements and improvements usually precede the surveys, and it is a matter of continual complaint that the government fails to extend its surveys as rapidly as the agricultural, lumbering, and mining industrial enterprises of the country demand, and it is a matter of common knowledge that the remote and more inaccessible regions, where the land is unfit for cultivation, have not been surveyed, and no provision for the survey thereof appears to have been contemplated. To fairly interpret this statute, the general descriptive features of the country to which it applies must be taken into account. In each of the states named there is a diversity of climate, timber, soils, and natural formations. This is especially true of Washington, which may be taken as representative of all, for the purpose of a more minute and particular description. Within this state are mountains, plains, hills, valleys, rivers, lakes, seas, forests, prairies, and mines of coal, iron, and almost every kind of minerals. It is divided by the Cascade range of mountains, running north and south across its entire breadth. East of the mountains the country is generally timberless, and the land is good, and easily brought under cultivation. However, it is not all of this description. There are in this part of the state small areas of timber of good quality, and the land is of inferior quality for agricultural purposes, though not barren. These timbered tracts answer the description in the statute of lands, unfit for cultivation, and chiefly valuable for timber, and they are within the limits of the public surveys, made and being made as rapidly as appropriations can be obtained for the purpose. All of the state west of the mountains is a timbered region, though there are a few small prairies. The river bottoms and valley lands, having a rich alluvial soil, is considered good farming land, although in its natural state it is covered by a dense growth of alder, ash, cottonwood, and maple timber, which is useful and valuable for fuel and many other purposes. The stumps and roots of this timber soon decay after the trees are cut down, and in two or three years' time they can be easily and cheaply removed and the land then yields bountiful crops of vegetables, grass, hops, grain, and fruits. Fortunes have been made out of the produce of comparatively small farms of this quality of land by men who, without capital, took the land in the rough, and by their own hands improved and cultivated it. This class of land, although valuable for timber, is not chiefly so, and is not unfit for cultivation, because it can be profitably cleared, improved, and cultivated. The most valuable timber, however, grows upon hilly and stony land. Fir and cedar stumps and roots will re-

main many years without decaying, and cannot be got rid of without much labor or great expense; and the soil of such timber-lands is not so rich, and will not yield so abundantly, as that which I have previously described, yet will, when cultivated, produce the same kind of crops. After removal of the valuable timber, and while the stumps remain, it is readily convertible into pastures, but is unfit for cultivation, because it cannot be at once made tillable without an expense greater than its value for agricultural purposes. Such land is chiefly valuable for its timber, and vast areas of it are to be found within the limits of the surveys. It is the character of land contemplated by this statute, and is as much subject to sale under its provision, if situated in near proximity to navigable water, or a farming community, or a city, or a railroad, as if it were in some remote, broken, rugged, and mountainous region. To a person acquainted with this country, this class of land is as readily distinguished from the alder bottom and valley lands, which are considered valuable for cultivation, as a forest is distinguished from a prairie.

The evidence before me leaves no uncertainty or doubt as to which class the tract conveyed by the patent to Budd belongs. On the part of the government, eight witnesses have testified, proving that the land can be cultivated after the removal of the timber and stumps ; that it is similar to other lands in the immediate vicinity, occupied by settlers, who each cultivate small tracts thereof; that in their opinion the land is valuable for agricultural purposes; and that the land is covered with a crust of leaf mould, which is an excellent fertilizer. And to confirm this testimony samples of the soil and specimens of the grain and grass grown by the settlers have been introduced. These witnesses show by their evidence that the tract, except about 15 acres, is timbered, and show nothing as to the value of the timber, except that there has not been any market or demand for it. This evidence is insufficient to warrant the cancellation of a patent. But the defendants have not been content to accept a Scotch verdict. They have met the issue with evidence of the most conclusive character. Thirteen witnesses were called, who testified that the soil is stony and inferior for farming purposes; that it contains excellent fir and cedar timber, besides hemlock and an undergrowth of various shrubs and brush ; that the trees are large, tall, and straight and sound, and will yield from 50,000 to 150,000 feet of the best quality of lumber per acre,—and this testimony and estimate is not controverted. The field-notes made by the government surveyor at the time of surveying the land, more than 25 years ago, describe the land as being stony and second rate, and the timber as fir, cedar, and hemlock, and the most convincing testimony of all is a series of 12 photographs, taken near the centers of each legal subdivision of the tract. These pictures exhibit, with unerring certainty and faithfulness, magnificent trees, standing so near together as to force each other to grow straight and tall. They satisfy the court that this tract is valuable and desirable for the timber upon it, and also that no man would be willing to subjugate this piece of forest for the mere sake of cultivating it.

But few words are needed. to dispose of the third proposition. The evidence shows that there were no valuable improvements on the land at the time Mr. Budd purchased it. Mr. Doherty, who at one time settled upon and attempted to improve the land, soon became discouraged and abandoned it; his cabin became dilapidated and worthless, and all his other improvements, except the remnants of a fence, disappeared long prior to Mr. Budd's entry.

The fourth reason alleged for conceling this patent also vanishes upon an examination of the evidence, for there is nothing to support the charge made in the bill, and explicitly denied in the answer, that prior to his application to purchase this land Budd entered into an agreement with Montgomery to acquire the title for him. If such an agreement was made, the evidence certainly fails to show how, when, or where it was done. There is no direct evidence of such an agreement, and the circumstances shown lead only to a suspicion, not to a reasonable inference, much less to a conclusion. These circumstances, briefly narrated, are as follows: (1) Mr. Budd gave a deed of the land to Montgomery within one month from the time of making final proof in the land-office and receiving the receiver's receipt. (2) About the time of this transaction Montgomery purchased a large number of other tracts of land in the vicinity of this one, from persons who entered it as timber-land, and he was known to be in the market as a buyer of timber-lands in that locality. (3) A man named White spent a considerable time previous to these purchases made by Montgomery in exploring the lands, and represented himself at the time as being in Montgomery's employ, and he acted as a witness for nearly all of the parties who made entries of timber-lands, and afterwards sold them to Montgomery, and he was also a witness for the defendant Budd in making his final proof as to this tract. These are the only circumstances shown by legal evidence within my opinion tending to prove the grave charge made against the defendant Budd of having falsely sworn, in his application to purchase this land, that he did not apply to purchase the same on speculation, but in good faith to appropriate it to his own exclusive use and benefit; and that he had not, directly or indirectly, made any agreement or contract, in any way or manner, with any person or persons, by which the title which he might acquire from the government of the United States should inure, in whole or in part, to the benefit of any person except himself, when in fact he had previously contracted with Montgomery for a consideration to acquire the title for Montgomery's benefit, and that the deed executed subsequent to the final step in perfecting his right to the land was in fact given pursuant to an agreement made anterior to the initiation of said proceedings.

Other testimony was introduced upon the trial, which was objected to as incompetent and irrelevant, tó the effect that Montgomery had at some time prior to Budd's entry of the land visited that part of the country, and while there had advised one settler in the neighborhood to take a timber claim, assuring him that the claim would be readily salable, and that he could make a bonus of at least $100 by the transaction; and that Mr. White, above referred to, had promised another man a bonus of

$100, if he would secure a timber claim, and sell it to Montgomery, and that this party acted upon the suggestion, and did enter 160 acres of timber-land, and, after making his final proof, deeded it to Montgomery, and received therefor $100 from Montgomery, by a check, which was afterwards cashed at the bank, which sum so paid was in addition to the amount necessary to pay for the land in the land-office, the land-office fees, and all expenses of acquiring the title, which Montgomery also paid. This evidence is immaterial, but I do not wish to rest my decision upon any mere rule of evidence or practice. I prefer to receive the evidence, and consider it for what it is worth, which is necessarily very little in this case. It was offered by the government upon the theory that it connected Montgomery with other transactions which were in fact fraudulent and against the government, and similar in kind to what is charged against him in this case; and it is assumed that he may be found guilty of the specific offense here charged upon evidence not proving, or tending to prove, the particular fact alleged, but going to prove the commission of other offenses of a similar kind. But, even if all this be true, this evidence proves nothing, and does not in any degree tend towards proving anything material as against the defendant Budd. There is no evidence connecting him with any conspiracy, so I do not see how it is possible to draw from the circumstances shown by this testimony any inference that Mr. Budd was guilty of any such fraudulent conduct as that of Mr. Searle, the self-impeached witness, who testified that he took a timber claim for Montgomery at White's suggestion for a bonus of $100.

Now, the material question involved is not whether Montgomery was contriving to acquire title to a large tract of land by evasion of the law, but it is whether the entryman—that is, the defendant Budd—was guilty of evading the law, or of perpetrating a fraud upon the United States, and whether he swore falsely in the affidavit which he filed upon applying to enter this land; for, if he acted in good faith up to the time of the issuance of the receiver's receipt, his right to the land then became perfect, and from that time the *jus disponendi* was in him, and, as against him, it cannot be contended that evidence of the misconduct of other persons, not shown to have to have been acting in concert with him, is sufficient to justify any inference whatever. This statute does not, by its terms, assume to obligate a person who acquires a title to land under it to keep the land, or to control his use or right to dispose of it for any period of time after he shall have complied with its provisions in perfecting his right to it. It only requires good faith on the part of the purchaser, and it is intended to prevent the acquisition of land from the United States at a wholesale rate by individuals or corporations, by using individual persons, who do not acquire it of their personal volition, but simply as mediums for the transmission of titles from the government to land-grabbers; and to effect this object the law goes no further than to prohibit entries by persons who have, prior to the filing of their applications, bound themselves by contracts.

Upon a careful examination of all the testimony, and in the light of

all the facts shown by the record, I conclude that there is an entire absence of testimony of the commission of any fraud or evasion of the laws of the United States, or of any such wrong on the part of the defendants as to justify the court in granting the relief prayed for in this bill. Let there be a decree in favor of the defendants.