551 F.2d 717
 49 A.L.R.Fed. 851
 HINES, INCORPORATED, a corporation, as owner and operator of
the M/V THOMAS W. HINES, BARGES HINES 411B and HINES 414 and
as Charterer and Operator and Owner Pro Hac Vice of the
BARGE HINES 410, for Limitation of or Exoneration from
Liability, Petitioner-Appellant,
v.
UNITED STATES of America, Claimant-Appellee.
 No. 75-1765.
 United States Court of Appeals,
Sixth Circuit.
 Argued April 9, 1976.
Decided March 2, 1977.
As Amended on Rehearing June 23, 1977.
 
 Wilder Lucas, Joseph A. Murphy, Lucas & Murphy, St. Louis, Mo., James G. Wheeler, Wheeler, Myre & Myre, Ky., Paducah, Ky., for petitioner-appellant.
 Donald Kronenberger, Admiralty & Shipping Section, Dept. of Justice, Washington, D.C., George J. Long, U.S. Atty., Louisville, Ky., for claimant-appellee.
 Before EDWARDS and CELEBREZZE, Circuit Judges, and HOGAN,* District Judge.
 EDWARDS, Circuit Judge.
 
 
 1
 This is a case of first impression involving a conflict between two statutes in the field of Admiralty. They are the Limitation of Liability Act, adopted in 1851, 46 U.S.C. § 181 et seq. (1970), and the Rivers and Harbors Act, originally passed in 1899, 33 U.S.C. § 401 et seq. (1970). We believe that the plain purposes of the Rivers and Harbors Act which we construe here cannot be served by subordinating it to the Limitation of Liability Act which Congress adopted in 1851 and that Congress did not intend the subordination to that Act which appellant now seeks. As a consequence, we hold that the statute later in time (The Rivers and Harbors Act) served to amend the unlimited language of the 1851 Limitation of Liability Act. We therefore affirm the order of the District Court which, by implication, reached this same result.
 
 
 2
 This is an admiralty case involving a series of accidents which occasioned loss of life and great property damage. An Ohio River tug owned and operated by appellant Hines was proceeding downstream when the Ohio River was at flood stage with three barges in its tow, two of which were loaded with gasoline. Attempting to enter the locks in a newly constructed government project, the tow boat was driven by strong water currents through the sluice gate and broke loose from its barges. Two of the barges struck the dam and locks, caught fire and sank, occasioning the major part of the property damage involved in the case.
 
 
 3
 The pilot on the tugboat was lost at the time the tugboat went through the sluice gate and a claim has been filed on behalf of his survivors. Claims asserting injuries to other members of the crew have also been filed.[1]
 
 
 4
 Hines initiated the first proceeding in this case by seeking limitation of liability in federal court and served notice on all of the parties to this proceeding. The United States appeared at the limitation proceeding and filed its claims. After Hines had filed an answer and counterclaim, the United States of America subsequently filed a motion to be exempted from the restraining order which had routinely issued restraining any other actions. The District Judge entered an order granting relaxation of the restraining order and allowing the filing of the government's action. It is from the order printed below that Hines has now taken an appeal under 28 U.S.C. § 1292(a)(1) (1970):
 
 
 5
 1. It appearing to the Court that the United States is entitled to an order relaxing the injunction contained in the Court's Order for Ad Interim Stipulation and Directing Issuance of Notice and Restraining Suits, entered May 10, 1972, and permitting the United States to file a complaint for damages and penalties pursuant to the Rivers and Harbors Act, 33 U.S.C. 401 et seq., it is therefore
 
 
 6
 2. Ordered, Adjudged and Decreed that the action pursuant to 33 U.S.C. 409, 411, 412, 414, and 415 for the costs incurred by the United States in removing the wrecks of Barge Hines 410 and Hines 411-B is not subject to the injunction contained in the Court's Order for Ad Interim Stipulation and Directing Issuance of Notice and Restraining Suits entered in this limitation proceeding on May 10, 1972; and it is further
 
 
 7
 3. Ordered, Adjudged and Decreed that the action pursuant to 33 U.S.C. 408, 411, and 412 for the costs incurred by the United States in making emergency, temporary, and permanent repairs to the completed portion of Cannelton Locks and Dam that sustained damage from being struck by the M/V Thomas W. Hines flotilla on April 20, 1972, is not subject to the injunction contained in the Court's Order for Ad Interim Stipulation and Directing Issuance of Notice and Restraining Suits entered in this limitation proceeding on May 10, 1972; and it is further
 
 
 8
 4. Ordered, Adjudged and Decreed that the action pursuant to 33 U.S.C. 408, 409, 411 and 412 for pecuniary penalties is not subject to the injunction contained in the Court's Order for Ad Interim Stipulation and Directing Issuance of Notice and Restraining Suits entered in this limitation proceeding on May 10, 1972; and it is further
 
 
 9
 5. Ordered, Adjudged and Decreed that the complaint of the United States for damages and penalties pursuant to the Rivers and Harbors Act, 33 U.S.C. 401, et seq., predicated upon the collision of the M/V Thomas W. Hines flotilla with Cannelton Locks and Dam on April 20, 1972, is ordered Filed; and it is further
 
 
 10
 6. Ordered, Adjudged and Decreed that the Motion for Relaxation of Restraining Order filed by the United States is hereby granted.
 
 
 11
 (Numbering of paragraphs added.)
 
 
 12
 We are persuaded that the Supreme Court decision in Wyandotte Transportation Co. v. United States, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967), establishes that the government has a right to in personam relief against the owner of a vessel for the negligent sinking of such vessel in the navigable waterways. The rationale of this opinion, which we quote extensively, applies to all the critical issues in this case.
 
 In Wyandotte the Supreme Court said:
 
 13
 "The position of petitioners is, therefore, that in the case of a negligently sunk vessel, the Government may require the owner to mark it; it may expect him to remove it or forfeit his interest in the vessel; and if the Government proceeds to remove the vessel, it possesses the right to sell vessel and cargo and retain the proceeds of these sales. Moreover, the Government may proceed criminally, under § 16 (33 U.S.C. § 411), against those responsible for the negligent sinking. But, petitioners argue, the Government may do no more. Under their view, the very detail of the Rivers and Harbors Act negates the possibility that Congress intended the Government to be able to recover removal expenses exceeding the value of the vessel and its cargo. Petitioners would apply the same analysis to a government action for declaratory or injunctive relief. Indeed, petitioners believe that authorization of the injunction remedy in another, analogous, section of the Act indicates congressional intent to withhold declaratory or injunctive relief as a means of enforcing § 15 (33 U.S.C. § 409).
 
 
 14
 "We do not agree. Petitioners' interpretation of the Rivers and Harbors Act of 1899 would ascribe to Congress an intent at variance with the purpose of that statute. Petitioners' proposal is, moreover, in disharmony with our own prior construction of the Act, with our decisions on analogous issues of statutory construction, and with a major maritime statute of the United States. If there were no other reasonable interpretation of the statute, or if petitioners could adduce some persuasive indication that their interpretation accords with the congressional intent, we might be more disposed to accept that interpretation. But our reading of the Act does not lead us to the conclusion that Congress must have intended the statutory remedies and procedures to be exclusive of all others. There is no indication anywhere else in the legislative history of the Act, in the predecessor statutes, or in nonstatutory law that Congress might have intended that a party who negligently sinks a vessel should be shielded from personal responsibility. We therefore hold that the remedies and procedures specified by the Act for the enforcement of § 15 were not intended to be exclusive. Applying the principles of our decision in Republic Steel, (United States v. Republic Steel Corp., 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903) we conclude that other remedies, including those here sought, are available to the Government.
 
 
 15
 "II.
 
 
 16
 "Article I, § 8, of the Constitution grants to Congress the power to regulate commerce. For the exercise of this power, the navigable waters of the United States are to be deemed the 'public property of the nation, and subject to all the requisite legislation by Congress.' Gilman v. Philadelphia, 3 Wall. 713, 725 (18 L.Ed. 96) (1866). The Federal Government is charged with ensuring that navigable waterways, like any other routes of commerce over which it has assumed control, remain free of obstruction. Cf. In re Debs, 158 U. S. 564, 586 (15 S.Ct. 900, 907, 39 L.Ed. 1092) (1895). The Rivers and Harbors Act of 1899, an assertion of the sovereign power of the United States, Sanitary District v. United States, 266 U. S. 405 (45 S.Ct. 176, 69 L.Ed. 352) (1925), was obviously intended to prevent obstructions in the Nation's waterways. Despite some difficulties with the wording of the Act, we have consistently found its coverage to be broad. See, e. g., Sanitary District v. United States, supra; United States v. Republic Steel Corp., 362 U.S. 482 (80 S.Ct. 884, 4 L.Ed.2d 903) (1960). And we have found that a principal beneficiary of the Act, if not the principal beneficiary, is the Government itself. United States v. Republic Steel Corp., supra, at 492 (80 S.Ct. (884) at 890.)
 
 
 17
 "Our decisions have established, too, the general rule that the United States may sue to protect its interests. Cotton v. United States, 11 How. 229 (13 L.Ed. 675) (1851); United States v. San Jacinto Tin Co., 125 U.S. 273 (8 S.Ct. 850, 31 L.Ed. 747) (1888); Sanitary District v. United States, supra. This rule is not necessarily inapplicable when the particular governmental interest sought to be protected is expressed in a statute carrying criminal penalties for its violation. United States v. Republic Steel Corp., supra. Our decisions in cases involving civil actions of private parties based on the violation of a penal statute so indicate. Texas & Pacific R. Co. v. Rigsby, 241 U.S. 33 (36 S.Ct. 482, 60 L.Ed. 874) (1916); J. I. Case Co. v. Borak, 377 U.S. 426 (84 S.Ct. 1555, 12 L.Ed.2d 423) (1964). In those cases we concluded that criminal liability was inadequate to ensure the full effectiveness of the statute which Congress had intended. Because the interest of the plaintiff in those cases fell within the class that the statute was intended to protect, and because the harm that had occurred was of the type that the statute was intended to forestall, we held that civil actions were proper. That conclusion was in accordance with a general rule of the law of torts. See Restatement (Second) of Torts § 286. We see no reason to distinguish the Government, and to deprive the United States of the benefit of that rule.
 
 
 18
 "The inadequacy of the criminal penalties explicitly provided by § 16 of the Rivers and Harbors Act is beyond dispute. That section contains only meager monetary penalties. In many cases, as here, the combination of these fines and the Government's in rem rights would not serve to reimburse the United States for removal expenses. It is true that § 16 also provides for prison terms, but this punishment is hardly a satisfactory remedy for the pecuniary injury which the negligent shipowner may inflict upon the sovereign. Cf. United States v. Acme Process Equipment Co., 385 U.S. 138 (87 S.Ct. 350, 17 L.Ed.2d 249) (1966).
 
 
 19
 "It was a similar process of reasoning that underlay our decision in United States v. Republic Steel Corp., 362 U.S. 482 (80 S.Ct. 884, 4 L.Ed.2d 903) (1960). That case concerned the deposit of industrial solids which, we believed, created an 'obstruction . . . to the navigable capacity' of a waterway of the United States, within the meaning of § 10 of the Act (33 U.S.C. § 403). We decided that the Government might seek injunctive relief to compel removal of such an obstruction, even though such relief was nowhere specifically authorized by the Act. We concluded that the authorization of injunctive relief in § 12 (33 U.S.C. § 406), which is applicable only to a limited category of § 10 obstructions (structures), should not be read to exclude injunctions to compel removal of other types of § 10 obstructions. In referring to the Act, we noted that 'Congress has legislated and made its purpose clear; it has provided enough federal law in § 10 from which appropriate remedies may be fashioned even though they rest on inferences. Otherwise we impute to Congress a futility inconsistent with the great design of this legislation.' 362 U.S., at 492 (80 S.Ct. (884) at 890).
 
 
 20
 "Although we do not approach the instant cases in the context of § 10, we believe the principles of Republic Steel apply, by analogy, to the issues now before us. The Government may, in our view, seek an order that a negligent party is responsible for rectifying the wrong done to maritime commerce by a § 15 violation. Denial of such a remedy to the United States would permit the result, extraordinary in our jurisprudence, of a wrongdoer shifting responsibility for the consequences of his negligence onto his victim. It might in some cases permit the negligent party to benefit from commission of a criminal act. We do not believe that Congress intended to withhold from the Government a remedy that ensures the full effectiveness of the Act. We think we correctly divine the congressional intent in inferring the availability of that remedy from the prohibition of § 15.
 
 
 21
 "It is but a small step from declaratory relief to a civil action for the Government's expenses incurred in removing a negligently sunk vessel. See United States v. Perma Paving Co., 332 F.2d 754 (C.A. 2d Cir. 1964). Having properly chosen to remove such a vessel, the United States should not lose the right to place responsibility for removal upon those who negligently sank the vessel. See Restatement of Restitution § 115; United States v. Moran Towing & Transportation Co., 374 F.2d 656, 667 (C.A. 4th Cir. 1967). No issue regarding the propriety of the Government's removal of Wyandotte's barge is now raised. Indeed, the facts surrounding that sinking constitute a classic case in which rapid removal by someone was essential. Wyandotte was unwilling to effectuate removal itself. It would be surprising if Congress intended that, in such a situation, the Government's commendable performance of Wyandotte's duty must be at Government expense. Indeed, in any case in which the Act provides a right of removal in the United States, the exercise of that right should not relieve negligent parties of the responsibility for removal. Otherwise, the Government would be subject to a financial penalty for the correct performance of its duty to prevent impediments in inland waterways. See United States v. Perma Paving Co., supra, at 758.
 
 
 22
 "We note, moreover, that under the Limitation of Shipowners' Liability Act of 1851, 9 Stat. 635, as amended, 46 U.S.C. § 181 et seq., the liability of a shipowner 'for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture' may be limited to 'the interest of such owner in such vessel, and her freight then pending'; but this limitation is available only if the act or damage occurred 'without the privity or knowledge of such owner.' 46 U.S.C. § 183. 'For his own fault, neglect and contracts the owner remains liable.' American Car & Foundry Co. v. Brassert, 289 U.S. 261, 264 (53 S.Ct. 618, 619, 77 L.Ed. 1162) (1933). The reading that petitioners would place on the Rivers and Harbors Act of 1899 would create an additional right of limitation, applicable in the special case of a sinking even though the owner is himself negligent. Yet Congress gave no indication, in passing the Rivers and Harbors Act, that it intended to alter or qualify the 1851 Act. 17 In the congressional failure to connect these two statutes, we find at least some evidence that petitioners' discovery of a limitation of liability in the Rivers and Harbors Act is unwarranted.[18]
 
 
 23
 "III.
 
 
 24
 "Petitioners contend that, despite our prior decisions and the silence of the Rivers and Harbors Act on this point, that statute authorizes them simply to abandon their negligently sunk vessels, without further responsibility for those vessels. We find in the Act no support for such an absolute right of abandonment. The provision upon which petitioners place most reliance, the final clause of § 15, creates a 'duty of the owner of (a) sunken craft to commence the immediate removal of the same, and prosecute such removal diligently.' Because 'failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as provided for in sections (19 and 20),' petitioners contend that such failure in no case has other consequences. But the duty imposed by and the remedy provided in the final clause of § 15 and §§ 19 and 20 (33 U.S.C. §§ 414 and 415) are not prescribed only for owners of negligently sunk vessels. Those provisions apply 'whenever a vessel . . . is wrecked and sunk in a navigable channel, accidentally or otherwise . . ..' Unlike a negligent sinking, a non-negligent sinking is not declared by the Act to be unlawful. It seems highly unlikely that Congress, having specified that only a negligent or intentional sinking is a crime, would then employ such indirect language to grant the culpable owner a personal civil immunity from the consequences of that crime.
 
 
 25
 "We believe the sections noted by petitioners are intended to protect the United States against liability for removing a sunken vessel if it chooses to do so. See Zubik v. United States, 190 F.2d 278 (C.A. 3d Cir. 1951); Gulf Coast Transp. Co. v. Ruddock-Orleans Cypress Co., 17 F.2d 858 (D.C.E.D.La.1927). Section 19 speaks explicitly of the discretion of the Secretary of the Army to break up, remove, sell, or otherwise dispose of a sunken vessel that has obstructed a waterway 'without liability for any damage to the owners of the same.' These sections do not negate the rights of the United States to obtain declaratory relief or to recover removal expenses. It is true that a proviso to § 19 states '(t)hat any money received from the sale of any such wreck . . . shall be covered into the Treasury of the United States.' But that proviso does not indicate that the United States, having chosen to remove a sunken vessel, shall receive no other monies. At most, the proviso establishes the proposition that, if the United States chooses to sell a wreck, the owner of the vessel has no right to any monies received. Section 20, the emergency section, closely parallels § 19. It adds nothing to petitioners' argument.
 
 
 26
 "Petitioners also claim that a substantial body of non-statutory law establishes the rule that a shipowner who has negligently sunk a vessel may abandon it and be insulated from all but in rem liability. They argue that Congress must have intended to codify this rule in the Rivers and Harbors Act. We do not accept petitioners' claim. Although several modern courts have assumed the existence of such a common-law rule, see, e. g., United States v. Moran Towing & Transportation Co., 374 F.2d 656, 667 (C.A. 4th Cir. 1967); United States v. Bethlehem Steel Corp., 319 F.2d 512, 518-519 (C.A. 9th Cir. 1963), the rule evaporates upon close analysis. We do not believe Congress intended the Rivers and Harbors Act to embody this illusory nonstatutory law."
 
 
 27
 Wyandotte Transportation Co. v. United States, supra at 199-209, 88 S.Ct. at 384 (Footnotes 11-16, 19-22 omitted).
 
 
 28
 While we note that in footnote 17, Wyandotte Transportation Co. v. United States, supra at 205-06, 88 S.Ct. 379, the Wyandotte opinion explicitly reserved decision on the effect of the Limitation Act (Limitation of Shipowners' Liability Act of 1851, 46 U.S.C. § 181 et seq. ) courts and commentators have read it as implying that in personam liability could not be so limited in a Wreck Act case. See In re University of Texas, C.A. 74-H-1438 (S.D.Tex. Apr. 2, 1975); In re Pentzien, Inc., 1974 A.M.C. 1201 (D.Neb.1974); In re Scranton Industries, Inc., 358 F.Supp. 7 (S.D.N.Y.1972); In re Pacific Far East Line, Inc., 314 F.Supp. 1339 (N.D.Cal.1970) aff'd on separate issue, 472 F.2d 1382 (9th Cir. 1973). See also In re Chinese Maritime Trust, Ltd., 361 F.Supp. 1175 (S.D.N.Y.1972), aff'd 478 F.2d 1357 (2d Cir. 1973), cert. denied, 414 U.S. 1143, 94 S.Ct. 894, 39 L.Ed.2d 98 (1974).
 
 
 29
 Benedict on Admiralty quotes the Wreck Act (33 U.S.C. § 409; Act of March 3, 1899, ch. 425 § 15; 30 Stat. 1152), and summarizes the effect of the Wyandotte opinion as follows:
 
 
 30
 Wreck Act. The so-called Wreck Act provides:
 
 
 31
 "It shall not be lawful . . . to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels . . . And whenever a vessel, raft or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful; and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States . . ."
 
 
 32
 (2) A vessel owner who fails to comply with this statute may not limit his liability for any resulting damage.[8] As soon as the owner decides to abandon his wreck, and succeeds in such abandonment, his further liability ceases. However, the shipowner will remain liable, without limitation, for removal expenses incurred by the United States where he is deemed to have "privity or knowledge" of the loss under § 183(a).
 
 
 33
 3 Benedict on Admiralty § 32, at 4-5, 4-6 (7th ed. I. Hall, A. Sann, K. Halajan 1975). (Footnote 7 omitted. Balance of fn. 8 omitted.)
 
 
 34
 Similarly concerning the pecuniary penalties provided by 33 U.S.C. § 412 for violations of 33 U.S.C. §§ 408, 409, Benedict says:
 
 
 35
 Criminal Statutes. Public policy forbids that a person liable to a fine or penalty under the criminal laws should be permitted to limit or reduce his liability by claiming the benefit of the shipowner's limitation statutes.
 
 
 36
 3 Benedict on Admiralty, supra at 4-7.
 
 
 37
 As to the cause of action described in paragraph 3 of the District Judge's order, more needs to be said.
 
 
 38
 The legal logic which applies to the Wreck Act claims and other pecuniary damage claims could apply just as well to the government's claims stated in the third paragraph of the District Judge's order. These claims relate to damages occasioned to the lock and dam and are asserted to represent the sum of $2,200,000. They are brought under the Rivers and Harbors Act, 33 U.S.C. §§ 408, 412 (1970):
 
 
 39
 It shall not be lawful for any person or persons to take possession of or make use of for any purpose, or build upon, alter, deface, destroy, move, injure, obstruct by fastening vessels thereto or otherwise, or in any manner whatever impair the usefulness of any sea wall, bulkhead, jetty, dike, levee, wharf, pier, or other work built by the United States, or any piece of plant, floating or otherwise, used in the construction of such work under the control of the United States, in whole or in part, for the preservation and improvement of any of its navigable waters or to prevent floods, or as boundary marks, tide gauges, surveying stations, buoys, or other established marks, nor remove for ballast or other purposes any stone or other material composing such works: Provided, That the Secretary of the Army may, on the recommendation of the Chief of Engineers, grant permission for the temporary occupation or use of any of the aforementioned public works when in his judgment such occupation or use will not be injurious to the public interest.
 
 
 40
 33 U.S.C. § 408 (1970).
 
 
 41
 This language appears to this court to be more positive than that employed in § 409 pertaining to negligently sunk vessels. Section 408 imposes strict liability,[2] as compared to § 409's requirement of negligence. Section 412 also provides that "any boat, vessel . . . or other craft used or employed in violating any of the provisions of sections 407, 408 and 409 of this title shall be liable for . . . the amount of the damages done by said boat, vessel . . . or other craft. . . ."
 
 
 42
 The sections we have referred to make unlawful injury to river improvements of the nature of the Cannelton Locks and Dam. Further, § 411, which follows, authorizes fines and imprisonment for anyone who knowingly violates these rules:
 
 
 43
 Every person and every corporation that shall violate, or that shall knowingly aid, abet, authorize, or instigate a violation of the provisions of sections 407, 408, and 409 of this title shall be guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $2,500 nor less than $500, or by imprisonment (in the case of a natural person) for not less than thirty days nor more than one year, or by both such fine and imprisonment, in the discretion of the court, one-half of said fine to be paid to the person or persons giving information which shall lead to conviction.
 
 
 44
 33 U.S.C. § 411 (1970).
 
 
 45
 All of this to the contrary notwithstanding, appellant Hines, Incorporated, the owner of the tugboat and barges involved in this accident, contends that it is entitled to limitation of liability under 46 U.S.C. § 183(a) (1970), which provides:
 
 
 46
 (a) The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.
 
 
 47
 While the question posed in this regard is certainly not without difficulty, and while we find no precedent squarely on point, we believe the Congressional intent in adopting §§ 408 and 411 did not contemplate application to the United States of the Limitation of Liability Act of 1851. We reach this conclusion for the following reasons:
 
 
 48
 1. As a general rule of law when the purposes of two statutes appear to be in conflict with each other, and there is no statutory language which makes any cross-reference, and, as here, the legislative history is silent as to the possible conflict, it is generally assumed that the later statute constitutes an amendment of the earlier one. United States v. Ohio Valley Company, Inc., 510 F.2d 1184, 1189 (7th Cir. 1975); 2 A. Sutherland, Statutory Construction §§ 51.02, 51.05 (C. Sands 4th ed. 1973).
 
 
 49
 2. While as indicated above we recognize that the Supreme Court in the Wyandotte case specifically reserved judgment on the precise question which our instant case requires us to decide, we believe the Wyandotte decision nonetheless points toward the no limitation result outlined above. Two paragraphs which we have previously quoted, in our view, constitute a strong underpinning of logical reasoning for giving precedence to the purpose of the Rivers and Harbors Act over the Limitation of Liability Act:
 
 
 50
 Article I, § 8, of the Constitution grants to Congress the power to regulate commerce. For the exercise of this power, the navigable waters of the United States are to be deemed the "public property of the nation, and subject to all the requisite legislation by Congress." Gilman v. Philadelphia, 3 Wall. 713, 725 (18 L.Ed. 96) (1866). The Federal Government is charged with ensuring that navigable waterways, like any other routes of commerce over which it has assumed control, remain free of obstruction. Cf. In re Debs, 158 U.S. 564, 586 (15 S.Ct. 900, 907, 39 L.Ed. 1092) (1895). The Rivers and Harbors Act of 1899, an assertion of the sovereign power of the United States, Sanitary District v. United States, 266 U.S. 405 (45 S.Ct. 176, 69 L.Ed. 352) (1925), was obviously intended to prevent obstructions in the Nation's waterways. Despite some difficulties with the wording of the Act, we have consistently found its coverage to be broad. See, e. g., Sanitary District v. United States, supra; United States v. Republic Steel Corp., 362 U.S. 482 (80 S.Ct. 884, 4 L.Ed.2d 903) (1960). And we have found that a principal beneficiary of the Act, if not the principal beneficiary, is the Government itself. United States v. Republic Steel Corp., supra, at 492 (80 S.Ct. (884) at 890).
 
 
 51
 Our decisions have established, too, the general rule that the United States may sue to protect its interests. Cotton v. United States, 11 How. 229 (13 L.Ed. 675) (1851); United States v. San Jacinto Tin Co., 125 U.S. 273 (8 S.Ct. 850, 31 L.Ed. 747) (1888); Sanitary District v. United States, supra. This rule is not necessarily inapplicable when the particular governmental interest sought to be protected is expressed in a statute carrying criminal penalties for its violation. United States v. Republic Steel Corp., supra. Our decisions in cases involving civil actions of private parties based on the violation of a penal statute so indicate. Texas & Pacific R. Co. v. Rigsby, 241 U.S. 33 (36 S.Ct. 482, 60 L.Ed. 874) (1916); J. I. Case Co. v. Borak, 377 U.S. 426 (84 S.Ct. 1555, 12 L.Ed.2d 423) (1964). In those cases we concluded that criminal liability was inadequate to ensure the full effectiveness of the statute which Congress had intended. Because the interest of the plaintiffs in those cases fell within the class that the statute was intended to protect, and because the harm that had occurred was of the type that the statute was intended to forestall, we held that civil actions were proper. That conclusion was in accordance with a general rule of the law of torts. See Restatement (Second) of Torts § 286. We see no reason to distinguish the Government, and to deprive the United States of the benefit of that rule.
 
 
 52
 Wyandotte Transportation Co. v. United States, supra 389 U.S. at 201-02, 88 S.Ct. at 385. (Footnotes omitted.)
 
 
 53
 It should be noted that § 286 of the Restatement (Second) of Torts, cited above by the Supreme Court, provides as follows:
 
 
 54
 The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part
 
 
 55
 (a) to protect a class of persons which includes the one whose interest is invaded, and
 
 
 56
 (b) to protect the particular interest which is invaded, and
 
 
 57
 (c) to protect that interest against the kind of harm which has resulted, and
 
 
 58
 (d) to protect that interest against the particular hazard from which the harm results.
 
 
 59
 Both §§ 408 and 411, which are quoted above, clearly establish "the standard of conduct of a reasonable man" which the court may apply to defendant shipowner in this case. They likewise may be read as identifying the United States as "one whose interest is invaded," and hence, warranting protection. In this case it is obvious that if the Limitation of Liability statute be so construed as to terminate in personam liability on the part of appellant Hines, there would be no possibility for the government to recover the bulk of its damages as set forth in its stated claims.
 
 
 60
 3. In Wyandotte the Supreme Court also gave weight to the fact that, as here, Congress had seen fit to enact criminal penalties. It said:
 
 
 61
 The inadequacy of the criminal penalties explicitly provided by § 16 of the Rivers and Harbors Act is beyond dispute. That section contains only meager monetary penalties. In many cases, as here, the combination of these fines and the Government's in rem rights would not serve to reimburse the United States for removal expenses. It is true that § 16 also provides for prison terms, but this punishment is hardly a satisfactory remedy for the pecuniary injury which the negligent shipowner may inflict upon the sovereign. Cf. United States v. Acme Process Equipment Co., 385 U.S. 138 (87 S.Ct. 350, 17 L.Ed.2d 249) (1966).
 
 
 62
 It was a similar process of reasoning that underlay our decision in United States v. Republic Steel Corp., 362 U.S. 482 (80 S.Ct. 884, 4 L.Ed.2d 903) (1960). That case concerned the deposit of industrial solids which, we believed, created an "obstruction . . . to the navigable capacity" of a waterway of the United States, within the meaning of § 10 of the Act. We decided that the Government might seek injunctive relief to compel removal of such an obstruction, even though such relief was nowhere specifically authorized in the Act. We concluded that the authorization of injunctive relief in § 12, which is applicable only to a limited category of § 10 obstructions (structures), should not be read to exclude injunctions to compel removal of other types of § 10 obstructions. In referring to the Act, we noted that "Congress has legislated and made its purpose clear; it has provided enough federal law in § 10 from which appropriate remedies may be fashioned even though they rest on inferences. Otherwise we impute to Congress a futility inconsistent with the great design of this legislation." 362 U.S., at 492 (80 S.Ct. (884) at 890).
 
 
 63
 Although we do not approach the instant cases in the context of § 10, we believe the principles of Republic Steel apply, by analogy, to the issues now before us. The Government may, in our view, seek an order that a negligent party is responsible for rectifying the wrong done to maritime commerce by a § 15 violation. Denial of such a remedy to the United States would permit the result, extraordinary in our jurisprudence, of a wrong-doer shifting responsibility for the consequences of his negligence onto his victim. It might in some cases permit the negligent party to benefit from commission of a criminal act. We do not believe that Congress intended to withhold from the Government a remedy that ensures the full effectiveness of the Act. We think we correctly divine the congressional intent in inferring the availability of that remedy from the prohibition of § 15.
 
 
 64
 It is but a small step from declaratory relief to a civil action for the Government's expenses incurred in removing a negligently sunk vessel. See United States v. Perma Paving Co., 332 F.2d 754 (C.A. 2d Cir. 1964).
 
 
 65
 Wyandotte Transportation Co. v. United States, supra at 202-04, 88 S.Ct. at 386. (Footnote omitted.)
 
 
 66
 Again, we believe this reasoning reinforces the statutory interpretation outlined above.
 
 
 67
 In the case closest to point which is argued to us or which we can find, the United States sued the owner of a tugboat for damaging a river lock. The Seventh Circuit, speaking through Judge Sprecher, said:
 
 
 68
 (T)he purpose of the combined effect of sections 14 and 16 (33 U.S.C. §§ 408 and 411) is to provide funds for the replacement and maintenance of improvements built by the United States. This purpose is implemented through an absolute liability standard. Thus, it would be wholly inconsistent to apply the limitation of liability provisions of section 183(a) to the absolute liability provisions of section 14, while at the same time not applying them to section 15 (wreck statute) (33 U.S.C. § 409) which speaks in terms of "voluntary or carelessly" allowing a vessel to sink. Furthermore, section 183(a) speaks in terms of lack of "privity and knowledge." That phrase implies that the owner be unaware of the fault in his vessel that caused an accident. Since the triggering mechanism for section 183(a) limitation of liability is tied to an awareness of negligence, and because negligence is not significant in actions under sections 14 and 16, it follows that the limitation of liability provisions are inapplicable to those sections.
 
 
 69
 United States v. Ohio Valley Co., Inc., 510 F.2d 1184, 1188 (7th Cir. 1975). (Footnote omitted.)
 
 
 70
 We agree that applying the Limitation of Liability Act to restrict the United States' right to recover under the Rivers and Harbors Act would violate the liability language of § 408. See also In re Chinese Maritime Trust, Ltd., 361 F.Supp. 1175 (S.D.N.Y.1972), aff'd 478 F.2d 1357 (2d Cir. 1973), cert. denied, 414 U.S. 1143, 94 S.Ct. 894, 39 L.Ed.2d 98 (1974).
 
 
 71
 4. Finally, we mention (albeit we do not rely upon this reason for decision) that the Limitation of Liability Act was passed long ago in 1851 for the conditions then existing, many of which changed materially before the Rivers and Harbors Act was adopted in 1899, and have changed even more materially since then. In 1954 Justice Black noted:
 
 
 72
 Judicial expansion of the Limited Liability Act at this date seems especially inappropriate. Many of the conditions in the shipping industry which induced the 1851 Congress to pass the Act no longer prevail. And later Congresses, when they wished to aid shipping, provided subsidies paid out of the public treasury rather than subsidies paid by injured persons.
 
 
 73
 Maryland Casualty Co. v. Cushing, 347 U.S. 409, 437, 74 S.Ct. 608, 623, 98 L.Ed. 806 (1954) (Black, J., dissenting). (Footnote omitted.)
 
 
 74
 Still later, in 1969, the Fifth Circuit said, "in the vast majority of cases limitation is denied for one reason or another . . .." Olympic Towing Corp. v. Nebel Towing Co., 419 F.2d 230, 235 (5th Cir. 1969), cert. denied, 397 U.S. 989, 90 S.Ct. 1120, 25 L.d.2d 396 (1970). While we expressly disclaim any intention of seeking to avoid the mandate of the 1851 statute, we do believe that there is no warrant in the facts of the present case for an expansive reading of the Limitation of Liability Act which would cripple the effectiveness of the important purposes of the Rivers and Harbors Act.
 
 
 75
 For these reasons, as we have already indicated, we affirm the relaxation order of the District Judge as to all three of the causes of action filed by the United States.
 
 
 76
 We believe that the three issues we have decided above are the most important legal issues in this case and the only ones squarely before us.
 
 
 77
 After much consideration of the other two issues (appellant's stated issues I and III) which appellant urges upon us, we have concluded that neither of them require reversal of the District Judge's order and that both of them can best be handled after an evidentiary record has been written and final judgment has been entered. Appellant states these issues as follows:
 
 
 78
 I. The District Court erred in allowing the United States to file suit separately outside the established limitation proceeding by ignoring the well established principle of bringing all admiralty claimants following a maritime disaster into a single concursus for the purpose of establishing the liability of the vessel(s) involved and the liability of the vessel(s) owners, if any, for the disaster.
 
 
 79
 III. The District Court erred in holding, by way of ruling on a motion, that the United States is prosecuting its action for damages to the dam in its sovereign capacity rather than as the assignee of the claims of Jones.
 
 
 80
 As to appellant's issue number I, since we have squarely held above that the government's claims as to which the District Judge granted relaxation of the preliminary injunction are not subject to the Limitation of Liability Act, 46 U.S.C. § 183 (1970), the District Judge's order of relaxation cannot be subject to challenge as a matter of law. As we read petitioner-appellant's brief, however, this claim appears to rest at least as much on equitable arguments as on the legal ones which we have rejected. Thus, appellant contends that the limitations proceeding is essentially equitable in nature, that the government originally filed its claims in said limitations proceeding, and should not now be allowed to escape from the concursus, and that it was an abuse of discretion for the District Judge to allow the government to do so. In this regard appellant relies upon Maryland Casualty Co. v. Cushing, 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806 (1954); Lake Tankers Corp. v. Henn, 354 U.S. 147, 77 S.Ct. 1269, 1 L.Ed.2d 1246 (1957); and Petition of Trinidad Corp., 229 F.2d 423 (2d Cir. 1955).
 
 
 81
 None of these cases, however, deal with claims of the sovereign which are not subject to the Limitation of Liability Act. Each case serves to support the proposition that a District Judge has discretion to maintain the concursus in order to serve the equitable purposes of fair distribution of a limited asset amongst competing complainants whose claims are subject to limitation of liability. Here the District Judge has in effect held that the United States is not subject to the Limitation of Liability Act, and to the degree (if any) that he possessed discretion in the premises, he exercised his judicial discretion in favor of relaxation of the injunction as to the United States. Appellant's cases are clearly inapposite.
 
 
 82
 No cases are cited to us (and we find none) wherein it has been held that a party not subject to the Limitation of Liability Act waives its right to an independent proceeding by filing a claim in the limitation proceeding. Nor does the delay of the United States in filing its motion for relaxation of the injunction appear to us to require a different result. If the delay has been damaging to appellant and has not been waived by this appeal, the doctrine of laches will allow appellant to advance its defense in this regard in the litigation outside of the limitation proceeding.
 
 
 83
 As to appellant's third stated issue above concerning its contention that the United States in filing suit outside the limitation proceeding is not proceeding as a sovereign but rather as assignee of the claims of the contracting concern, Jones, we again perceive no basis for reversing the District Judge's order.
 
 
 84
 On the facts as presently alleged by Hines, we do not believe Hines has standing to contest the government's final decision to accept the work of the contractor, Jones. According to the pleadings in this case, Hines is neither a party nor a third-party beneficiary of the contract between the United States and Jones. Further, beyond doubt the United States owns the dam and the locks. Regardless of its contract arrangements with Jones, the United States doubtless has title to the permanent improvements which the contractor affixed to the structures as against all other parties, including Hines.
 
 
 85
 Hines seeks, of course, to rely upon a decision of the District Engineer, contracting officer of the Corps of Engineers, holding Jones Construction Company responsible for repairs to permanent work at the Cannelton Dam. This decision, however, was appealed by Jones to the Division Engineer who had clear authority to act in the premises under the Department of Army, Office of the Chief of Engineers, Regulation No. 1180-1-1, dated December 1, 1969 particularly under paragraph 71-205(c)(2)e. Acting under this authority the Division Engineer, Major General W. L. Starnes, on August 4, 1972, reversed the decision of the contracting officer holding as set forth in Appendix A, Findings, paragraph 10: "Upon this analysis I hereby overturn the decision of the contracting officer, and under the authority delegated to me find that, as between the contracting parties, the government bears the responsibility for repair to permanent work damaged by the referenced navigational accident." (Emphasis added.)
 
 
 86
 As to such "permanent work," we perceive no basis for appellant Hines' contention that the claims of the United States are not brought in a sovereign capacity.[3]
 
 
 87
 We express no view as to whether or not an amended complaint might change this result.
 
 
 88
 We note that the government advises that these cases and the limitation proceeding have been consolidated for trial, but we do not find an entry to this effect in the Docket entries supplied to this court. Clearly, however, the District Court can enter such an order in the interest of judicial convenience and in order to balance the equities of all parties involved. On remand it should do so.
 
 
 89
 Nothing we have said is intended to express any view as to the merits of the claims of any of the parties. We affirm the implied holding of the District Judge that the United States is entitled to proceed in its claims without limitation under the Limitation of Liability Act and remand the case for further proceedings in the District Court.
 
 District Engineer, Louisville
 
 90
 1. Pursuant to ECI 71-103 and 71-205(c)(2), I have reviewed the subject, yet undocketed, appeal. On 2 August 1972, I personally conferred with appellant's and your representatives.
 
 
 91
 2. In consideration of the facts and evidence presented, I have determined that the responsibility for repair of the permanent work damage, as between appellant and the Government, lies with the Government and, accordingly, have sustained the appeal, subject to the following agreed conditions:
 
 
 92
 a. The supplemental agreement (modification) which you will issue shall contain a release from this appeal, upon contractor's acceptance, and an agreement that appellant will formally withdraw this appeal by notice to the ENGBCA.
 
 
 93
 b. Such agreement shall be expressly conditioned by incorporating language contained in the inclosure hereto.
 
 
 94
 3. The referenced agreement and your findings in support thereof shall cite this letter and determination as your authority. Detailed findings shall remain in this office to support my determination.
 
 
 95
 /s/ W. L. STARNES
 
 W. L. STARNES
 Major General, USA
 Division Engineer
 
 96
 SUBJECT: Findings and Determination Under Appeal of J. A. Jones Construction Co. (Cannelton Dam Accident Repair of Permanent Work Damage)
 
 TO: FILES
 FROM: Division Engineer
 DATE: 2 Aug. 72
 
 97
 1. The Division-level review of the subject contract appeal was finalized by an informal conference-type hearing held in this office 2 August 1972. Representatives of the Appellant, the Contracting Officer and my staff were present for this conference.
 
 
 98
 2. The facts surrounding the accident were substantially agreed upon by the parties. The issue in dispute was that of contractual responsibility for repair of the permanent work damage, repair of damage to temporary works being agreed as Appellant's contractual responsibility.
 
 
 99
 3. The Appellant, through legal counsel, presented three alternative avenues for the relief sought:
 
 
 100
 a. The contract, in light of the status of work, placed responsibility upon the Government;
 
 
 101
 b. The language of the standard "Possession Prior to Completion" clause was mandatorily added to the contract by operation of law, under the well-recognized "Christian doctrine" (viz. the contract, notwithstanding its expressed terms, was legally amended to include the mandatory new language); and
 
 
 102
 c. The Government was negligent in its operation of the locks.
 
 
 103
 4. The contracting Officer denied the claim on all three counts; timely appeal from that decision ensued, placing the matter before me under authority delegated by the head of the agency in Engineer Regulation 1180-1-1, paragraphs 71-103 and 71-205(c)(2).
 
 
 104
 5. Upon the facts and legal theories presented by both parties, I find that the Government was not negligent in its lock operation, and therefore find no basis for overturning the Contracting Officer on that point.
 
 
 105
 6. The contract interpretation question posed in composite by Appellant's initial two arguments are not as readily resolved. The pertinent theshold (sic) facts, as presented to me, are these: The contract, initially written and advertised in compliance with then existing Armed Services Procurement Regulations, expresses, inter alia, the agreement that, prior to final completion and acceptance, all work performed shall be the contractor's responsibility ("Permits and Responsibilities"). After advertisement, but prior to award, on 29 January 1965 the ASPR was changed to, among other things, make the "Possession Prior to Completion" clause mandatory for contracts such as this.
 
 
 106
 This clause sets forth an exception to the responsibilities expressed in the "Permits and Responsibilities" clause where the Government assumes beneficial occupancy or use of a constructed facility or part thereof. The ASPR implementation requirements relative to the January 1965 change state that the new clause shall be mandatory in all Invitations for Bids issued 90 days or more after the change's effective date, viz. 29 April 1965.
 
 
 107
 7. Case law cited by both parties is conflicting with respect to this question; no case squarely in point has been cited to me and I know of none. (Bradford, ASBCA 1966, 66-2 BCA 5831 and Bell & Flynn, ASBCA 1966, 66-2 BCA 5855, among others cited by Appellant, and Mittry v. U. S., 1931, 73 Ct.Cl. 341, cited among others by the Contracting Officer, are distinguishable).
 
 
 108
 8. Accordingly, the remaining questions for my decision are, in order:
 
 
 109
 a. What are the contract terms?, and
 
 
 110
 b. Under such terms, as between the contracting parties, who must bear the burden of costs associated with repair of the damage to the permanent work?
 
 
 111
 9. In reaching my answer to these questions I have considered among other things the further facts that the 1st Stage of dam construction was substantially completed in accordance with the contract terms; such stage was, in fact, if not by contractual expression, a severable part of the total work inasmuch as its independent operation by the Government prior to total dam completion was expressly agreed as necessary for the Governmental purposes of navigation and related project uses as well as the contractual purpose of river diversion; that the contractor, upon turning such portion of the dam over to the Government, retained no practical possession or control over such structure or its use by the Government; that the obtaining of casualty insurance, indemnifying against catastrophies such as this is a practical (economically) impossibility due to excessive premium costs; that there is no expressed requirement for such insurance in the contract and to imply it would be unreasonable due to the magnitude of the effect such requirement would have on project construction costs. Interpretation of the contract to require a contingency bid would violate a fundamental policy in Government procurement. To conclude that the contractor assumed the risk of damage to completed work after it was taken for use by the Government would be unconscionable. In essence, I interimly conclude that the contractor was free from capability to have prevented or indemnified against this accident or its results. With respect to the contract terms, I have determined that the "Possession Prior to Completion" language of the ASPR revision should have been incorporated by the Contracting Officer in the Invitation for Bids leading to this contract.
 
 
 112
 The significance of such change, particularly with respect to the basic responsibility for this expensive completed work over a period of several years, is too critical to project costs to have been omitted. The fact that the ASPR change was not expressly "mandatory" for this contract, in my opinion is not determinative. Contracts of this magnitude are relatively few in this agency; their cost, complexity and their scope should not be under evaluated. Accordingly, I believe it to be a fundamental requirement that contracts of this nature must, to the fullest extent possible, express at the time of award the total current procurement policy of the Government. The cited ASPR change reflects clearly the policy that the "Possession Prior to Competition" clause was in the best public interest, else it would not be promulgated as mandatory in application. Therefore, I interpret the ASPR change to reflect the then current contract requirements. I find that implementation instructions for the change provided a "grace" period for contract forms revision and dissemination to Government contracting offices, during which period use of the language, though not mandatory was, nevertheless, after its 29 January 1965 effective date, approved for use by any office where forms revision and field dissemination were complete. Such was the case here. I view my obligation in these types of situations as requiring attention not only to what was done but to what should have reasonably been done. This is particularly germane where, to do otherwise, it would place upon a contractor a duty which was a practical impossibility to fulfill. I find that ample time was available for incorporation of this clause into the Invitation for Bids, and because of its stature and significance such event should have taken place. I view the cited "Christian" doctrine to constructively include within its philosophy, this result, and I believe that the administrative Board of Contract Appeals would reach the same conclusion, even if by different reasoning, since the contractor can prove that it relied upon such conclusion for purposes of bid formulation.
 
 
 113
 10. Upon this analysis, I hereby overturn the decision of the Contracting Officer and, under the authority delegated to me find that, as between the contracting parties, the Government bears the responsibility for repair to permanent work damaged by the referenced navigational accident.
 
 
 114
 11. The Contracting Officer shall be advised to implement this decision in accordance with my written instructions which will be issued after my final discussions with the contractor advising it of the basis upon which I will implement this decision.
 
 
 115
 /s/ W. L. STARNES
 
 W. L. STARNES
 Major General, USA
 Division Engineer
 
 
 *
 Honorable Timothy S. Hogan, Chief United States District Judge for the Southern District of Ohio, sitting by designation
 
 
 [1]
 None of these claimants have sought to intervene in this appeal, hence no issue pertaining to them is presented. Further, the record does not disclose the present status of these claims
 
 
 [17]
 We do not, of course, pass on the applicability of the Limitation Act, before or after passage of the Rivers and Harbors Act, to the facts of the case now before us. We only note that the principle for which petitioners are contending is very much like the principle of limitation of liability, known to the statutory maritime law of the United States almost 50 years prior to passage of the Rivers and Harbors Act
 
 
 [18]
 Petitioners' theory is, moreover, in conflict with the administrative interpretation of the statute. A regulation promulgated by the Department of the Army provides that 'a person who . . . negligently permits a vessel to sink in navigable waters of the United States . . . may . . . be compelled to remove the wreck as a public nuisance or to pay for its removal.' 33 C.F.R. § 209.410. The origins of this regulation go back to 1901. Letter from William Cary Sanger, Acting Secretary of War, to William L. Hughes, July 31, 1901. See United States v. Republic Steel Corp., 362 U.S. 482, 490, n.5 (80 S.Ct. 884, 889, 4 L.Ed.2d 903) (1960)
 
 
 [8]
 The Snug Harbor, 53 F.2d 407, 1931 A.M.C. 1487 (E.D.N.Y.1931) (duty to mark, buoy and light the wreck is personal and nondelegable)
 
 
 [2]
 Such liability must, of course be tested by the precise language of the statute itself which requires proofs of one or more of the acts enumerated therein by the person or persons complained against. In advance of trial of this case we do not seek to interpret the statute by identifying what proofs may serve to satisfy the statutory language;
 
 
 [3]
 In our view the assignment of claim to the United States, dated August 25, 1972, and signed by the president of Jones Construction Company, is mere surplusage which adds nothing to the United States' rights to recover for third-party damage to the "permanent work" which it owns. We express no view as to any damage to nonpermanent work of contractor Jones, if any such was damaged in this accident, since it is clearly not within the scope of this appeal